## Clewell *v.* Pummer, Appellant.

Argued January 15, 1957. Before Jones, C. J., Bell, Chidsey, Musmanno, Jones and Cohen, JJ.

*Sidney L. Wickenhaver*, with him *Frederick E. Smith, C. William Freed, Ross & Smith,* and *Montgomery, McCracken, Walker & Rhoads,* for appellants.

*Laurence H. Eldredge,* with him *William M. Power,* and *Paul A. McGinley,* for appellees.

OPINION BY MR. JUSTICE BELL, April 26, 1957:

Plaintiffs brought an action of trespass against the owners of a country inn. While descending from their relative's apartment on the third floor of the inn, at about 1:30 a.m. on June 3, 1951, plaintiffs opened a door on the second floor, believing they were on the first floor,[*] and stepped out onto a sloping roof from which they fell to the ground, sustaining serious injuries. Plaintiffs recovered verdicts totaling $33,700. Defendants moved for judgment non obstante veredicto and for a new trial. The lower Court entered a judgment n.o.v. for the defendants upon the two-fold ground that plaintiffs had failed to prove negligence and that they were guilty of contributory negligence as a matter of law. The negligence alleged by plaintiffs was that the defendants had a second floor doorway in such a position that it could be mistaken for a ground floor exit, without having such door locked and without having any warning sign. The lower Court having entered a judgment n.o.v., did not pass on defendants' motion for a new trial.

Plaintiffs appealed to this Court which, in *Clewell v. Pummer,* 384 Pa. 515, 121 A. 2d 459, reversed the

---

[*] Although twice that evening they had gone from the first to the third floor and back again.

judgment n.o.v. and said: "In the lower Court the defendants filed a motion for new trial which was not disposed of by the Court in view of its conclusion that the plaintiffs were barred from recovery because of culpable negligence. The defendants are entitled to have the lower Court pass on their motion for a new trial and, if dissatisfied with the Court's decision in that respect to re-appeal to this Court.

"The judgments entered by the Court below are reversed and the record is remanded for action not inconsistent with this Opinion."

Thereafter the Record was remanded to the lower Court and counsel for both parties argued before the lower Court defendants' motion and reasons for a new trial. The lower Court dismissed the motion for a new trial, believing that this Court had decided that the lower Court was not empowered to grant a new trial. The lower Court misapprehended this Court's decision in *Clewell v. Pummer*, 384 Pa., supra. What this Court decided in that case, and all that we decided, was that the lower Court could not hold as a matter of law that plaintiffs had failed to make out a prima facie case of negligence or that plaintiffs were guilty of contributory negligence as a matter of law. We did not pass upon the questions of "the weight of the evidence, or the credibility of witnesses, or any alleged trial errors"; we only decided, we repeat, that considering plaintiffs' evidence in the light most favorable to them, they made out a prima facie case. Moreover, as above cited, this Court in its opinion said: "The defendants are entitled to have the lower Court pass on their motion for a new trial and, if dissatisfied with the Court's decision in that respect to re-appeal to this Court."

The lower Court wrote a clear, comprehensive and convincing opinion in which it said that if it had the power to grant a new trial it would do so because the

*plaintiffs' testimony was against the weight of the evidence and resulted in a miscarriage of justice.* More particularly, the lower Court characterized plaintiffs' evidence as "inconsistent, evasive, unreliable and at times incredible". The lower Court in its opinion said, inter alia:

"In fairness to defendants, however, and with all due deference to the judgment of the Supreme Court, since it is possible that we may have misconstrued the effect of the language of the opinion in the connection above noted, particularly since the appellate court actually has ruled only on the motions for judgments n.o.v., we feel compelled hereby to state for the record, in contemplation of the re-appeal which the Supreme Court has suggested might be taken, that were this Court free to pass independent discretion on the weight and sufficiency of the evidence, we would conclude that the verdicts were contrary thereto. . . .

"Moreover, in addition to the considerations mentioned in our former opinion, we have also concluded from a careful reexamination of the entire record, coupled with the reaction of the trial judge to the manner and demeanor of the various witnesses at the trial, that the jury to a considerable degree must have been influenced by emotional or other extraneous factors rather than the weight of the evidence in determining the liability questions. From such reexamination, we have serious doubts as to the credibility of plaintiffs and some of their witnesses, particularly Raymond Schaffer, the wife-plaintiff's brother in whose apartment they were visiting on the evening in question . . .

"From all the evidence in the case, we find it simply incredible to believe that plaintiffs did not know where they were or that they honestly thought they were on the ground level when they opened the door on the second floor, as they somewhat inconsistently

testified, or that the very precipitous manner in which they stepped over a doorsill five and one-half inches high and through the doorway into total darkness, as they themselves described, constituted the exercise of due care on their part. From a consideration of all the testimony in the case, including that of other witnesses on their behalf, we have doubt that the conditions of light in the hallways were so deficient as plaintiffs tried to make out, or that the wife-plaintiff was thereby compelled to hold onto Mrs. Schaffer's dress so that the former could not observe her surroundings as she followed the latter through the building earlier in the evening. (It is significant, incidentally, that Mrs. Schaffer was not called as a witness, she having a more protracted connection with the plaintiffs and the general situation leading up to the accident than did her husband who was called on plaintiff's behalf.)

"There are several instances in the record of inconsistencies, if not indications of outright falsehood, in the evidence given by plaintiffs and some of their witnesses. One glaring example of this was the testimony of both the husband-plaintiff and Mr. Schaffer with respect to the physical existence of an outside storm door in the doorway in question, in addition to the conventional inside door which the wife-plaintiff admitted opening just prior to the accident. . . .

". . . The overwhelming weight of the evidence leaves little or no doubt but that the [storm] door was physically hung on its hinges at the time in question. The witnesses' zeal to advance plaintiffs' case by voluntarily exaggerating the situation so as to deny in the obvious spirit of partisanship even that which was otherwise overwhelmingly shown, though not controlling on the merits, tends to cast doubt on their testimony as a whole.

"Another indication of the lack of credibility of some of plaintiffs' witnesses was the evasive and equivocal type of answers which characterized much of their testimony. . . .

"Another example is the husband-plaintiff's statement of the consequences of the fall to himself. . . .

". . . When [these references are] coupled with what we consider the inherent improbabilities in their version of the unfortunate affair, however, we would conclude, were we free to do so, that a new trial should be had . . . ."

Where a trial Judge or Court sees and hears the witnesses, it has not only an inherent fundamental and salutary power, but it is its duty, to grant a new trial when it believes the verdict was capricious or was against the weight of the evidence and resulted in a miscarriage of justice: *Bellettiere v. Philadelphia,* 367 Pa. 638, 81 A. 2d 857; *Wilson v. Kallenbach,* 332 Pa. 253, 2 A. 2d 727; *Campbell v. Philadelphia Transportation Co.,* 366 Pa. 484, 77 A. 2d 437; *Elia v. Olszewski,* 368 Pa. 578, 84 A. 2d 188; *Maloy v. Rosenbaum Co.,* 260 Pa. 466, 103 A. 882; *Frank v. Losier & Co., Inc.,* 361 Pa. 272, 64 A. 2d 829; *Dinan v. Supreme Council C.M.B.A.,* 213 Pa. 489, 62 A. 1067. In such a case we will not reverse, unless there is a clear abuse of discretion or an error of law which necessarily controlled the grant of the new trial: *Edelson v. Ochroch,* 380 Pa. 426, 111 A. 2d 455; *Foster v. Waybright,* 367 Pa. 615, 80 A. 2d 801; *Mozino v. Canuso,* 384 Pa. 220, 120 A. 2d 300.

In *Coward v. Ruckert,* 381 Pa. 388, 113 A. 2d 287, Justice MUSMANNO, speaking for this Court, said (page 393): "In Frank v. W. S. Losier & Co., Inc., 361 Pa. 272, 276, this Court . . . said: '. . . The granting of a new trial is an inherent power and immemorial right of the trial court and an appellate court will not find

fault with the exercise of such authority in the absence of a clear abuse of discretion. (citing cases) One of the least assailable grounds for the exercise of such power is the trial court's conclusion that the verdict was against the weight of the evidence and that the interests of justice therefore require that a new trial be awarded; especially in such a case is an appellate court reluctant to interfere.' "

Moreover, in such circumstances, namely, where the jury's verdict is capricious or against the weight of the evidence or results in a miscarriage of justice, it should not be allowed to stand, no matter how many new trials must be granted in the interest of justice: *Elia v. Olszewski,* 368 Pa., supra, and *Maloy v. Rosenbaum Co.,* 260 Pa., supra. In *Maloy v. Rosenbaum Co.,* 260 Pa., supra, the Court said (page 472):

". . . While the ascertainment of the underlying facts, and the drawing of the inferences and final conclusions therefrom, are for the jury, even where strong conflicting oral evidence is produced by a defendant, yet, in every such instance, a grave responsibility rests upon the trial judge to see to it that no verdict contrary to the weight of the evidence or shocking to judicial conscience is allowed to stand, no matter how many new trials must be granted in order to effect the ends of justice; . . .". See to the same effect: *Elia v. Olszewski,* 368 Pa., supra, and *Dinan v. Supreme Council C.M.B.A.,* 213 Pa., supra.

In *Dinan v. Supreme Council,* the case had been tried in the lower Court five times. On the fourth trial, the trial Judge directed a verdict for the defendant which this Court reversed. On the fifth trial the jury returned a verdict for plaintiff. The trial Court refused a new trial although it said: "The verdict was shocking to every fair sense of justice and right". This Court reversed and held that it was the duty of the

trial Court to set aside a verdict which it found to be shocking.

The Court en banc, speaking through the trial Judge, pointed out in great detail how inconsistent, evasive, unreliable and at times incredible was the testimony of plaintiffs or their witnesses. Although we do not have the benefit of seeing and hearing the witnesses, we have examined the record and could not say had the lower Court granted a new trial, that there had been an abuse of discretion or that its grant was predicated on an error of law.

While technically reversing, actually we are sustaining the grant of a new trial by the lower Court. We can do so either by remanding the Record to the Court below with directions to grant a new trial, or this Court itself can, under *Downes v. Hodin*, 377 Pa. 208, 216, 104 A. 2d 495, and §2 of the Act of May 20, 1891, P. L. 101, grant a new trial. The latter action is simpler and less circuitous.

Judgment reversed and new trial granted.

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE CHIDSEY:

I am in accord with the majority of this Court that the court below was free to arrive at its own conclusion as to whether a new trial should be granted. However, I disagree with the conclusion it reached. I carefully reviewed the record on the first appeal and again on the present appeal. I find as much to be said for and against the credibility of the witnesses for the defendants as for and against the credibility of the witnesses for the plaintiffs. Since the matter turned on the question of credibility, to my mind the case was one peculiarly for the jury, and its determination should be upheld.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In the case of *Commonwealth v. Green,* 387 Pa. 515, decision in which was handed down on January 17, 1957, I expressed amazement that this Court should allow the Court of Common Pleas of Philadelphia County to reverse a decision of the Supreme Court of Pennsylvania. I must repeat that same expression of astonishment in the instant case.

On March 13, 1956, we decided that Harry Clewell and Helen Clewell, plaintiffs in the case at bar, had proved their claims of negligence against the defendants Frank Pummer and Minnie Pummer, owners of the California House, a hotel in Bucks County. The case was then remanded to the Court of Common Pleas of Bucks County for certain action. The Bucks County Court, while formally accepting our mandate, proceeded to point out wherein we were wrong in our decision. The case was then appealed to us for the second time and, now, this Court, instead of adhering to its original decision, accepts the criticisms of the lower Court, and reverses the position it decisively proclaimed a year ago. The facts are as follows:

On June 3, 1951, the defendants maintained on the second floor of their hotel a door so constructed, placed, and draped, as to permit of its being erroneously taken by persons unfamiliar with the establishment as a ground floor exit. On the day in question the plaintiffs, deceived into believing this door was indeed a first floor exit, passed through it, and plunged to the ground beneath, sustaining serious injuries. The jury returned verdicts in favor of husband and wife in the respective sums of $5,000 and $28,700. The defendants filed motions for a new trial and for judgment n.o.v. The Bucks County Court granted the motion for judgment n.o.v., but took no action on the new trial mo-

tion for the obvious reason that after entering judgment for the defendants, a new trial would be a superfluity. The plaintiffs appealed to this Court. We reversed the judgment n.o.v. and sent the case back for disposition of the motion for new trial. In doing this, we said: "The defendants are entitled to have the lower Court pass on their motion for a new trial and, if dissatisfied with the Court's decision in that respect to re-appeal to this Court."

In saying this we did not intend that the case was to be re-argued on matters which we had already disposed of. Without actually spelling it out, we supposed that everyone, including the Court of Common Pleas of Bucks County, would understand that the arguments for a new trial would be based on the 30 reasons for a new trial filed by the defendants' attorneys. Of these 30 reasons, 25 were devoted to alleged trial errors and errors in the charge. The other 5 were the stereotyped ones that the verdicts were against the evidence, against the weight of the evidence, against the charge of the Court, and excessive.

After hearing arguments on the motion, the Bucks County Court stated that it was compelled to refuse a new trial because of what we had said in our decision of January 17, 1957. The Court went on to say, however, that the plaintiffs were not entitled to their verdicts. Speaking through the Trial Judge, Judge SATTERTHWAITE, the Court said that it still believed the plaintiffs guilty of contributory negligence; this, in spite of our definitive decision on that very subject, namely: "It is the decision of this Court that the plaintiffs were not guilty of contributory negligence as a matter of law and that the jury was warranted in reaching the conclusion that the plaintiffs were not guilty of contributory negligence as a matter of fact."

Of course, Judge SATTERTHWAITE may entertain his own views on the case, but it seems paradoxical, if not stultifying, for this Court, after officially disposing of a matter before us, to accept, without any acknowledgment of error, Judge SATTERTHWAITE's views and turn its back on its own decision still warm with the recency of its pronouncement and the decisiveness of its adjudication.

In our decision of March 13, 1956, we exculpated the plaintiffs from any charge of contributory negligence and held further that they had established a clear case of liability against the defendants. After devoting four pages to the subject of negligence we specifically declared: "We conclude in this case that the question of negligence was also one for the jury, and find, after reading the record in the light most favorable to the verdict-winner, as we are required to do, that the jury was warranted in reaching the conclusion that the defendants were negligent."

It is astounding, therefore, to perceive this Court, now, after that unequivocal decision of but a year ago, approving the animadversions of the Bucks County Court, and deciding that the defendants are entitled to a new trial for a reason which was not even thought of by them as a ground for a new trial. So satisfied were the defendants' lawyers that there was nothing to the subject which has become the burden of the Majority's Opinion that they did not mention it—in all the 30 reasons which they advanced for a new trial.

Although the Court speaks of the verdicts being against the weight of the evidence, the only point it presses is the one of credibility of witnesses. But this Court has declared with a repetition that has become almost monotonous that the credibility of witnesses is always for the jury. Nonetheless the Majority today goes into an extended discussion of the credibility of

individual witnesses in a manner more indicative of an attorney's summation to a jury than an exposition by an appellate court of applicable legal principles.

The Majority not only attacks the credibility of the plaintiffs and their witnesses, but it seeks to make morons of the plaintiffs. The Majority quotes the lower Court which says: "From all the evidence in the case, we find it simply incredible to believe that plaintiffs did not know where they were or that they honestly thought they were on the ground level when they opened the door on the second floor . . ."

If the plaintiffs *knew* or honestly thought they were on the second floor and yet walked out through the aperture which would send them to their possible death or mangling injury, they could only be morons. To say that the plaintiffs *knew* they were on the second floor, and, in spite of that fact, dived into the darkness and abyss, means they either were crazy or in such a state of mental aberration that they believed themselves birds and could reach the ground by using their heretofore never-known wings,—in which event they would still be fit subjects for a home for the feeble-minded. But there is nothing in the record to even wildly suggest that the plaintiffs were other than normal, healthy people intent on living and on retaining unimpaired and uninjured their arms, legs, and necks.

It can, of course, be argued that the plaintiffs *should have known* they were on the second floor and that their forgetting the fact that they had just descended only one flight from the third floor constituted a lack of reasonable care under the circumstances, but to utter, with the assurance of an edict of Jupiter Optimus Maximus, that the plaintiffs *knew* they were on the second floor and, despite that knowledge, walked open-eyedly into disaster, is nothing short of preposterous. Moreover, in our Opinion of March,

1956, we disposed of this very question: "That the plaintiffs did *not* know they were on the second floor is scarcely debatable because it can be taken for granted that they were not trying to reach the ground via the second story roof." (Italics in original).

It was the contention of the plaintiffs at the trial that the hallway which led to the second floor door was so dimly lighted that they were handicapped in discovering just where they were. Whether the illumination was or was not scanty in the hallway became a question for the jury to decide and, to the extent that it played a part in their deliberations, the jury decided the moot point in favor of the plaintiffs. But the Majority still insists the hall was well-lighted. It says: "We have doubt that the conditions of light in the hallways were so deficient as plaintiffs tried to make out." But why does the Court find, in March, 1957, that the hallway was brilliantly lighted when it found, in March, 1956, that it was poorly lighted? In our Opinion of March, 1956, we said: "The anemic glimmer from the feeble 15-watt bulb in the ceiling above shed no light on the true situation." Even the defendant, Mrs. Pummer, testified to the infirm lighting in the hallway. Why, in spite of the testimony of this extremely adverse party, does the anemia of 15 watts in 1956 develop into glaring luminosity in 1957?

The Majority has quoted at length from Judge SAT-TERTHWAITE's Opinion and, in doing so, of course accepts his reasoning as its own. This Court has often said that where a trial court grants a new trial it is not enough to say that justice requires a new trial.* It must specify objectively the grounds on which a new trial is predicated. What are the sturdy stones on which the Court rests the extraordinary structure of

---

\* *Carroll v. Pittsburgh*, 368 Pa. 436.

a new trial, when a building, which houses a fair and legal disposition of the controversy has already been reared?

The Majority, quoting Judge SATTERTHWAITE, says: "The jury to a considerable degree must have been influenced by emotional or other extraneous factors rather than the weight of the evidence in determining the liability questions." What were the emotional and other extraneous factors which influenced the jury? So serious an indictment cannot be left dangling in the miasmatic air of innuendo and suspicion. There is not a syllable of evidence in the whole 450 pages of evidence which clothes the sinister skeleton of "extraneous factors" with the flesh of reality. If the Trial Judge saw or felt those phantoms why did he not name them? And since the learned Judge kept these phantoms hidden in the weeds of suggestive phraseology why did the Majority not flush them out before giving them substance and standing in this Court? What were the extraneous factors? Was the jury threatened? Was the jury bribed? Was the jury improperly influenced? What and who were the disembodied spirits driving the jury from the light of a conscientious discharge of their solemn and sworn duties into the murky caverns of irregular and improper deliberation?

And what were the emotional factors at which the lower Court hints, and which the Majority repeats, without pointing to one loincloth of evidence with which to clothe the naked charge?

In an apparent heroic effort to find some little peg upon which to hang his charge that the plaintiffs' testimony was against the weight of the evidence and resulted in a miscarriage of justice, the Trial Judge wants to know why a Mrs. Schaffer was not called as a witness. It will be remembered that the plaintiffs

had visited Mr. and Mrs. Schaffer who lived in a third floor apartment of the California House where the accident occurred. Mrs. Schaffer was a tenant of the defendants, who owned the hotel. The Court intimates that had Mrs. Schaffer been summoned, her testimony would have been injurious to the plaintiffs' case. I have no way of knowing why Mrs. Schaffer was not called as a witness, but if her testimony would have been so helpful to the defendants' case, why was she not subpoenaed by the defendants? Why is sauce for the goose, something extraneous for the gander?

The Court finds inconsistencies if not "outright falsehoods" in the testimony regarding the so-called "outside storm door" on the second floor. The plaintiffs denied that any outside storm door was in place on the night of the accident. The Court, accepting the defendants' side of the controversy in this phase of the case, says: "The overwhelming weight of the evidence leaves little or no doubt but that the [storm] door was physically hung on its hinges at the time in question."

In point of fact, it does not matter, so far as the issue of liability is concerned, whether the doorjamb was hung with a storm door or not. If the plaintiffs actually believed they were on the first floor and if the portal was so constructed that they could reasonably believe they were on the first floor (and *that* was the plaintiffs' contention), opening a storm door would not have been any more proof that the portal was a second floor exit than that it was a first floor exit. The whole point in the case is that the defendants allowed on the second floor of their hotel an outside door so placed, so hinged and so draped as to produce the picture of an outside first floor door and if, in addition to the normal door, there was also a storm door, how would the latter's existence dissuade the plaintiffs from believing they were on the first floor? Are storm doors not also used on first floors?

But, accepting the Court's argument that there were inconsistencies on this point, what does that prove? Is it not the function of the jury to pass on inconsistencies? The plaintiffs produced three witnesses who said that there was only one door hung in the doorway. The defendants produced five witnesses who said that there were two doors. Does the fact that the defendants had two more witnesses than the plaintiffs on this disputed point conclusively prove that there were two doors? When some of these witnesses were being examined on this very controverted question, plaintiffs' counsel asked the Court to sequester the witnesses. The Trial Court agreed: "I agree with your position, Mr. Eldredge, in view of the fact that *credibility of witnesses* is going to be the keystone in this case for the jury's ultimate decision, apparently."*

Was it not for the jury to decide this question, which hinged on credibility alone, as to whether there was a storm door on the second floor, and did the jury not decide this point, with all others in the case, in favor of the plaintiffs?

The Trial Judge says in his Opinion: "Other uncontradicted evidence and photographic exhibits definitely established that at times both *prior* and *subsequent* to the date in question, there was such a storm door in place and that it was furnished with two hooks and eyes to fasten it in a closed position." Designedly or unintentionally the Trial Judge by this statement supports the plaintiffs' position, namely, that although the California House at times used a storm door over the door in issue, there was none there on the night of the accident, June 3, 1951. It will be noted the Judge said that the photographs established the storm door

---

* Italics throughout, mine.

was in place *prior* and *subsequent* to the date of the accident. The eight photographs introduced in evidence show the storm door in question, but *none* of the photographs was taken during the year 1951!

The arguments advanced for a new trial are all shadows, each one thinner and less-fed than the preceding one. For instance, the Court says: "Another indication of the lack of credibility of some of plaintiffs' witnesses was the evasive and equivocal type of answers which characterized much of their testimony." Who says that their testimony was evasive and equivocal? Not the jury. The jury accepted their testimony and brought in substantial verdicts for both plaintiffs. And how and why was the testimony "evasive and equivocal?" The Court does not specify.

The Court says: "Another example is the husband-plaintiff's statement of the consequences of the fall to himself." Who said the husband-plaintiff's testimony was evasive and equivocal as to the consequences of the fall to himself? The jury brought in a verdict for him which no one questioned—not even the defendants. The Court itself said: "Defendants' attacks upon the verdicts as excessive have now been abandoned and, we think, *properly* so."

The Court says: "We have serious doubts as to the credibility of the plaintiffs and some of their witnesses, particularly Raymond Schaffer, the wife-plaintiff's brother in whose apartment they were visiting on the evening in question." The only observation to be made on this comment must take the form of a question, namely, Why? Why, particularly Raymond Schaffer?

The Court says that the plaintiffs were lacking in the exercise of due care because of "the very precipitous manner in which they stepped over a doorsill five and one-half inches high." What is precipitous about stepping over a doorsill five and one-half inches high?

And, particularly, why is it *very* precipitous?  If one believes he is on the first floor and the doorsill is five and one-half inches high, why should stepping over so normal and commonplace a doorsill be evidence of lack of due care?

Judge SATTERTHWAITE gives as another illustration of the "lack of credibility" in the plaintiffs the statement that "the wife, who weighed about 135 pounds, in falling through the doorway after placing only one foot through the opening, pulled her husband, who weighed about two hundred pounds, after her while holding his hand."

What is so extraordinary about this?  Even a 500-pound giant can be caught off balance.  And what does the Court intend to prove by this observation anyway?  Does it doubt that the husband-plaintiff fell with the wife?  And suppose that she did not pull him but that in the infinitesimal fraction of a second that he realized she was falling, he attempted to save her and, in doing so, was thrown himself into the void, should he be punished for that?  Could a husband have done less for his wife?  Once the defendants set in motion, because of their negligence, a chain of circumstances which precipitated both plaintiffs into disaster, it is of little consequence what either party did when they were in the grip of gravitational forces over which they naturally had no control.

All the reasons advanced by the Bucks County Court in attempted devastation of the plaintiffs' claim are but shadows, apparitions, and specters in the arena of polemics.  They are but the ghosts of arguments which fought bitterly at the trial and were laid to rest by the jury's verdict.  The only possible flicker of life in any of these contentions would be the issue of credibility, but since the determination by the jury, that issue has become a dead ash.  Why, therefore, are these

arguments animate again? Why does this Court treat them as if they had just appeared over the threshold of a new creation? The Bucks County Court itself recognized and conceded that the issue of credibility was solely for the jury. In charging the jury, Judge SATTERTHWAITE said: "I do not intend to review the facts in this case, although the trial has been long and there have been a great many facts produced. They have been reviewed for you by counsel, *you have paid very good attention to the witnesses on the stand,* and I cannot emphasize too much the fact that it is your duty, not mine, to recall the facts and draw the conclusions from the actual true facts from all the testimony and all the other evidence in the case. Having found those facts, then you will take the law from the Court, but *neither I nor counsel either should or would attempt to dictate to you what you should find as to the facts,* and please do not attempt to try to find my own opinion in these instructions, because I do not intend to give any opinion. *I am thankful that it is your decision and not mine, because I consider this a rather difficult case factually."*

If it was a factual case at the time of the trial, why is it something else now? Why must this case be tried again? What can be done which was not done before? No error was committed during the trial, no error appears in the Court's charge, no complaint was made as to the conduct of counsel on either side, no evidence was admitted which should have been excluded, and no evidence was excluded which should have been admitted. Trial counsel were exceedingly able. The jurors were attentive. As quoted above, the Trial Judge said to the jury: "You have paid very good attention to the witnesses on the stand." The jurors were conscientious; they deliberated for six hours before they came to their unanimous decision. Why must this be

done all over again? Why must the parties, the witnesses, and the lawyers repeat their performance as if they were actors on a stage rather than serious doers in the drama of grim and earnest life? Five and one-half years have passed since Mrs. Clewell felt the world fall away beneath her feet and she ended up in plaster casts, wheel chairs, crutches, and braces. Why must she take this fall again in Court when justice does not require it? The verdict of the jury was not arbitrary; it was not capricious. As is true in every case, the contending parties saw the accident through different eyes, but the jury had but one set of scales upon which to weigh and evaluate the evidence. No one has complained that the scales were unreliable, no one has said that the scales were tampered with. What has happened to the rule announced in *Trainer v. Fort*, 310 Pa. 570: "The rule is well settled in Pennsylvania that if a case is supported by competent oral testimony, no matter how strong may be the countervailing testimony, it is for the jury. . . . In Grambs v. Lynch et al., 4 Pennypacker 243, this court in an opinion of Mr. Justice PAXSON said: 'It is settled law that when a case depends upon oral testimony, such testimony must be submitted to the jury. Authorities are hardly needed for so obvious a proposition.' "

It is as clear as if it were written in letters a mile high that Judge SATTERTHWAITE has a fixed view on this case, incidentally one quite contrary to the one he expressed during the trial. He, of course, is entitled to that opinion but he may not subject the whole machinery of justice to a meaningless whirring of wheels because of his own private views which are not supported by the facts or by the law applicable thereto. In *Carroll v. Pittsburgh*, 368 Pa. 436, Mr. Justice STERN (later Chief Justice) said: "A new trial should not be granted because of a mere conflict in testimony

or because the trial judge on the same facts would have arrived at a different conclusion . . . Neither should it ordinarily be granted on the ground that the verdict was against the weight of the evidence where the evidence is conflicting and the jury might have found for either party . . . It would therefore seem clear that there was a palpable abuse of discretion in the court's granting a new trial on the ground that the verdict was contrary to the evidence (meaning presumably the weight of the evidence) and that in the interest of justice a new trial should be had . . ."

Sending this case back for a second trial is sending Justice to the second floor for a possible fall when, after many vicissitudes, it has already safely reached the ground floor of merited vindication, and I, therefore, vigorously dissent.

