## Sarachman *v.* Avery, Appellant.

Argued October 11, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*William C. Walker,* with him *Theodore O. Struk,* and *Dickie, McCamey, Chilcote & Robinson,* for appellant.

*John J. Hickton,* with him *McArdle, Harrington, Feeney & McLaughlin,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 9, 1965:

The trial judge in this case, after a long period of deliberation and much soul-searching, ordered a new trial because he believed that the verdict was against the weight of the evidence and that justice required, aye demanded, a new trial.

The plaintiff, Joseph Sarachman, an Allegheny County motorcycle policeman was patrolling the Liberty Tubes in Pittsburgh, traveling in the left lane of a tunnel which runs north and south. The defendant, Harvey Charles Avery, was driving an automobile in the same direction, but in the right lane. Large signs in the tunnel warned motorists not to cross from one lane to the other. The defendant admitted that he crossed from the right to the left but argued that this crossing had nothing to do with the accident which happened about three-fourths of the way through the tunnel.

The plaintiff testified that the defendant's car was about one and one-half car lengths in front of him in the right lane and that, without any preliminary notice of his intention, he suddenly crossed over to the left lane in front of the plaintiff and that he, the plaintiff, made every effort to avoid colliding with the car but was unable to do so and a collision followed, resulting in his being seriously injured.

The defendant testified that the plaintiff was pursuing him with siren blaring, that when he heard the siren he started to "slow up," then, when the policeman got close to him, he speeded up, the policeman did the same, caught up with him and struck his car in the rear.

If the defendant saw the motorcycle policeman pursuing him, heard the warning siren, and slowed down to find out what the policeman wanted, why, then, did he accelerate just as the policeman was about to overtake him? The defendant explained that he feared the policeman would run him down with his motorcycle? In the first place, in a duel between a motorcycle and a full-sized automobile, the automobile has the decided superiority of power, formidableness and defensive armor over the fragile two-wheeler. In the second place, what sort of a game of "tag" did the defendant think he was playing with the policeman, by slowing up to communicate with the policeman and then dashing away as the policeman approached? The trial court, in ordering the new trial, said: "The defendant's story of events immediately prior to the accident is confused and literally impossible. We cannot comprehend how a rational mind could base a judgment upon such testimony, and we must assume that the jury either misunderstood the evidence or completely disregarded it."

Even in cold print the defendant's story seems to lack verisimilitude. There was no suggestion that the policeman was intoxicated, berserk or inexperienced. He had been a member of the excellent Allegheny County Police for thirteen years, he was married and had two children. Everything in the case would argue against the bizarre explanation spoken by the defendant. The trial judge had the advantage of actually seeing the defendant and the other witnesses. He was shocked by the verdict and it is easy to see why.

While this case was on trial, the tragic death of President John F. Kennedy occurred. The plaintiff-appellee suggests that the strange verdict here could have been reached because the jury became inflamed against all policemen on account of the seeming laxity of attention to duty on the part of the policemen of Dallas, Texas, before, during and after the heart-rending killing of the youthful and beloved President of the nation. Angry resentment flared throughout the land that the Dallas police should have permitted a night club proprietor, with no business whatsoever in the police station, not only to enter the police station, but in full view of the policemen preening themselves for the television cameras, to shoot down the slayer of the President so as to seal for all time the mouth of the man who probably would have told what motivation lay behind his inhuman and brutal deed.

Whether the Dallas events did have any effect on the minds of the jury in this case is not precisely known, any more than the world will ever know why John Fitzgerald Kennedy, in the flower of his brilliant, beautiful and heroic career, dedicated to America, should have had to die.

The ordering of a new trial by the court below was in full accordance with the criterion laid down by this Court in *Clewell v. Pummer*, 388 Pa. 592, where Chief Justice BELL said: "Where a trial Judge or Court sees and hears the witnesses, it has not only an inherent, fundamental and salutary power, but it is its duty, to grant a new trial when it believes the verdict was capricious or was against the weight of the evidence and resulted in a miscarriage of justice . . . In such a case we will not reverse, unless there is a clear abuse of discretion or an error of law which necessarily controlled the grant of the new trial."

We find no such abuse here or error of law, and accordingly affirm the order of the court below.

Mr. Justice JONES and Mr. Justice ROBERTS concur in the result.