610 A.2d 1082

**Shirley A. MORRISON, Administratrix of the Estate of George Morrison, Deceased, Appellant,**

**v.**

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE, OFFICE OF MENTAL HEALTH (WOODVILLE STATE HOSPITAL), and Schleifer's Ambulance Services and J.P. Harika, M.D., Appellees.**

Commonwealth Court of Pennsylvania.

Argued Feb. 4, 1992.

Decided May 29, 1992.

Reargument Denied July 16, 1992.

in dicta discussing whether Act 170 allows a municipality to include legal charges in its review fee.

246

Samuel J. Cordes, for appellant.

Esther Joy Schwartz, for appellee, Schleifer Ambulance Services.

Before COLINS, and SMITH, JJ., and SILVESTRI, Senior Judge.

SMITH, Judge.

Shirley A. Morrison appeals from a post-trial order of the Court of Common Pleas of Allegheny County granting Schleifer's Ambulance Services (Ambulance Service) a new trial. The issue raised in this appeal is whether the trial court erred in granting a new trial because evidence pertaining to the conduct of the ambulance crew immediately after a passenger escaped from the ambulance and fell to his death was improperly admitted into evidence. For the following reasons, the trial court is reversed.[1]

## I

On July 29, 1986, Mrs. Morrison's husband, George Morrison, was being transported by Ambulance Service from a police station in Rankin, Pennsylvania to Woodville State Hospital (Woodville), a hospital operated by the Commonwealth of Pennsylvania, Department of Public Welfare, Office of Mental Health (OMH). Mr. Morrison was a mental health patient at Woodville and was on a brief visit home when he began to hallucinate and became violent. Officer Mudd, the local Chief of Police, transported Mr. Morrison from his home to the police station and OMH arranged for Ambulance Service to transport him from the police station to Woodville. While the ambulance was traversing the Fort Pitt Bridge crossing the Monongahela River, Mr. Morrison forced his way out of the ambulance, ran a short distance and fell over the side of the bridge to his death. Mrs. Morrison filed a wrongful death and survivor action against OMH, J.P. Harika, M.D.[2] and Ambulance Service alleging, inter alia, that Ambulance Service was negligent by failing to assess Mr. Morrison's condition; failing to restrain, control and watch him; allowing him to escape the ambulance; and failing to remain at the scene to assist the rescue squad.

1. Mrs. Morrison initially filed this appeal in the Superior Court which granted Ambulance Service's motion to transfer the case to this Court by order dated September 19, 1991.

2. Mrs. Morrison settled with OMH and Dr. Harika prior to trial and executed a joint tort-feasor release.

Prior to trial, Ambulance Service filed a motion in limine to preclude evidence regarding the fact that the ambulance crew left the scene of the accident after Mr. Morrison fell from the bridge. Ambulance Service reasoned that since the ambulance crew was unable to assist Mr. Morrison from their position on the bridge, evidence regarding their actions after the fall is prejudicial and that such prejudice outweighs any probative value; and since there is no evidence that Mr. Morrison could have been rescued or would have survived the fall, the contested evidence is irrelevant. Mrs. Morrison asserted that the evidence is admissible and relevant because it is probative of the ambulance crew's lack of proper training and continuing negligent activity; and its probative value is not substantially outweighed by any prejudice to Ambulance Service's case. The trial court denied Ambulance Service's motion in limine.

At trial, the ambulance crew and Theodore J. Schleifer, the owner of Ambulance Service, testified. Bernard J. Jozwiak testified that the extent of his training in transporting mental health patients was his boss' advice to treat the patients like human beings, and he had not attended any courses, classes or training seminars. Further, he was in the back of the ambulance with Mr. Morrison when he climbed into the front passenger seat and escaped through the door on the passenger side; he followed Mr. Morrison through the passenger door and ran after him; and after Mr. Morrison leaned over the rail and fell, the ambulance crew drove to a telephone where they called 911 and Mr. Schleifer who instructed them to return to the base where they discussed the incident with Mr. Schleifer. John C. Fritzius, the driver, added that he had emergency medical training (EMT) at a community college but did not pass the course; and after they returned to the base he and Mr. Jozwiak transported another patient before going to the police station with Mr. Schleifer. Theodore J. Schleifer testified that he knew from his EMT training that state law required that an attendant accompany a patient in the back of an ambulance; and the only training that he provided his employees regarding transporting people with

mental disorders was his instruction that attendants treat mental patients like human beings.

Both parties presented expert witnesses who testified regarding local and national standards of care and specifically addressed the degree of training an ambulance crew should have; how an ambulance crew should assess a patient's condition; what restraints a trained ambulance crew would use when transporting a mental patient; and how a trained or reasonable ambulance crew would have reacted to an escape such as this one. Mrs. Morrison's experts opined that it would not have been possible for Mr. Morrison to have escaped in the fashion that Ambulance Service claims he did; and that a trained ambulance crew presented with this situation would have left one member of the crew behind while the other sought assistance. Ambulance Service's expert opined that although common sense should have told the ambulance crew to stay around after the fall, leaving was not a breach of their duty. Further, Ambulance Service presented the video tape deposition testimony of a doctor who testified that the primary cause of Mr. Morrison's death was a forceful blow to the head which knocked him unconscious and that he drowned.

Mrs. Morrison also presented the testimony of two fact witnesses to challenge the credibility of Ambulance Service's witnesses. An electrician who was working on a temporary dock below the Fort Pitt Bridge testified that after he heard an object strike the edge of the dock and fall into the water, he looked up to the bridge and saw two men looking over the side and an ambulance with all of the doors open, including the back door. A nurse at Woodville testified that she received a telephone call from an excited and upset male who identified himself as an ambulance driver and told her that on the way to Woodville, George Morrison jumped out of the back of the ambulance, bolted to the railing, jumped over the railing and hit the dock.

After the close of evidence, the trial court instructed the jury that its verdict should be based on the evidence and the application of legal principles, not on emotions, and that the mere happening of an unfortunate event which results in

death does not automatically give rise to the right to compensation from a party who has some connection with the event. The court further instructed that the burden of proof is on Mrs. Morrison to establish the liability of Ambulance Service; if the jury determines that Mr. Morrison died from the blow on the head, then the ambulance crew's failure to remain, right or wrong, did not have anything to do with his death; and that an ambulance service which holds itself out to the public to accept anybody who wishes to use its service is called a common carrier for hire and is held to the highest degree of care.

The jury returned a verdict for Mrs. Morrison assessing the causal negligence at 75% attributable to Ambulance Service, 25% attributable to OMH, no negligence attributable to Mr. Morrison, and awarded $450,000 in damages. Ambulance Service filed post-trial motions and the trial court granted Ambulance Service a new trial because it determined that it erred in permitting testimony regarding the ambulance crew's actions in leaving the scene of the accident. The trial court reasoned that the actions were represented as cold and callous indifference to life and should not have been admitted since Mr. Morrison was probably already dead when the ambulance crew left the scene of the accident and, therefore, the actions did not contribute to his death.[3]

## II

The trial court has the inherent power to grant a new trial. *Kralik v. Cromwell*, 435 Pa. 613, 258 A.2d 654 (1969). On appeal from an order granting a new trial, this Court's scope of review is limited to determining whether the trial

---

**3.** The trial court also noted that it may have erred in charging the jury that Ambulance Service was acting as a common carrier but indicated that it would not decide that issue since it determined that a new trial was warranted based on "prejudicial error." This Court notes that even if the characterization "common carrier" was error, it was harmless since the jury was properly instructed that an ambulance service which holds itself out to the public to accept anybody who wishes to use its service is traditionally viewed in the law as required to exercise the highest degree of care. *See McNamara v. Schleifer Ambulance Service, Inc.*, 383 Pa.Superior Ct. 100, 556 A.2d 448 (1989).

court abused its discretion or committed an error of law which controlled its decision to grant the new trial. *Gilligan v. Shaw,* 441 Pa. 305, 272 A.2d 462 (1971); *Penneys v. Segal,* 410 Pa. 308, 189 A.2d 185 (1963). Ambulance Service primarily argues that the abuse of discretion standard is applicable herein since the decision to exclude the evidence was a discretionary ruling; and, in the alternative, since the trial court did not certify or state that this was the sole and exclusive reason for granting a new trial, this court can affirm the grant of a new trial for any erroneous application of law found in the record.

Ambulance Service's first argument is without merit because the decision for review before this Court is not the discretionary ruling to exclude evidence, but rather whether the reason the trial court gave for granting a new trial was in itself an error of law. Second, the trial court need not certify or state that the reason it granted a new trial was the sole and exclusive reason; contrariwise, all that is required is that the reason "clearly appears, either by certificate of the trial court or in its opinion on the new trial motion...." *Keefer v. Byers,* 398 Pa. 447, 449, 159 A.2d 477, 478 (1960). Accordingly, the issue here is whether, in a negligence case, evidence which is offered to prove breach of a duty need also be probative of causation to be relevant and therefore admissible.

The rules of evidence in Pennsylvania provide that evidence is admissible when it is relevant to a fact sought to be proved. *Martin v. Soblotney,* 502 Pa. 418, 466 A.2d 1022 (1983). Evidence is relevant when it tends to make a fact more or less probable and it need not conclusively prove the proposition for which it is offered. *Id.;* Leonard Packel & Anne B. Poulin, Pennsylvania Evidence § 401, at 122 (1987) (quoting J. McCormick, Evidence § 185, at 542 (3d ed. 1984)). However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion. *Whistler Sportswear, Inc. v. Rullo,* 289 Pa.Superior Ct. 230, 433 A.2d 40 (1981). Prejudice refers to an undue tendency to suggest a decision on an improper basis and does not refer to merely being detrimental to one

party's case. *Id.* Further, evidence which is offered for one purpose need not be excluded merely because it is inadmissible for another. *See Orlando v. Herco, Inc.*, 351 Pa.Superior Ct. 144, 505 A.2d 308 (1986).

The Pennsylvania Supreme Court has adopted the following provision of the Restatement (Second) of Torts § 323(a) (1965) as representing an accurate statement of the law. *See Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983).

> § 323. Negligent Performance of Undertaking to Render Services
>
> One who undertakes, gratuitously or for consideration to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise care increases the risk of harm....

This provision, however, does not change the burden of a plaintiff to establish the elements of a negligence action or to invoke a duty where one does not exist. *Morena; Boyce v. United States Steel Corp.*, 446 Pa. 226, 285 A.2d 459 (1971). Duty is predicated on the relationship existing between the parties at the relevant time and requires some degree of knowledge. *See Morena.*

In the matter sub judice, Mrs. Morrison had the burden of establishing that Ambulance Service owed a duty which required it to conform to a certain standard of conduct; Ambulance Service failed to conform to the standard required; Mr. Morrison's death was caused by Ambulance Service's conduct; and actual loss was suffered. *See Morena; Berry v. Titus*, 346 Pa.Superior Ct. 376, 499 A.2d 661 (1985), *appeal dismissed*, 517 Pa. 58, 534 A.2d 756 (1987). The testimony of the ambulance crew and the experts sufficiently established that Ambulance Service owed a duty to Mr. Morrison and that the standard of care required was that the service carefully

and safely transport Mr. Morrison from the police station to Woodville. *See also McCluskey v. United States,* 583 F.Supp. 740 (S.D.N.Y.1984) (the standard of care required of an ambulance service is to safely deliver the patient into the custody of medical personnel competent to attend to the patient).

Regarding the proposition that Ambulance Service breached its duty to Mr. Morrison, the jury was presented with conflicting testimony concerning the degree of training required and how trained ambulance attendants would have operated in comparison with how the ambulance crew operated. The trial court is correct that since Ambulance Service's expert testified that Mr. Morrison's death was actually caused by his head injury and drowning, the disputed evidence is not relevant to causation. However, Mrs. Morrison was not seeking to establish that the ambulance crew could have rescued Mr. Morrison; her burden was to convince the jury that Ambulance Service's failure to provide a trained ambulance crew was the proximate cause of Mr. Morrison's death. Thus, the evidence in dispute was properly offered to prove the material fact that Ambulance Service failed to conform to local and national standards of conduct by not providing trained attendants.[4]

Finally, this is not a matter in which any prejudice to Ambulance Service's case substantially outweighed the probative value of the disputed evidence. The trial court sufficiently cured the danger of unfair prejudice arising from confusion over whether the ambulance crew's actions in leaving the scene of the accident, discussing the incident with Mr. Schleifer, and transporting another patient before going to the police station were the cause of death, by instructing the jury that if Mr. Morrison died as a result of his head injury, the ambulance crew's failure to remain at the scene did not cause the death. *See Whistler.* Thus, the trial court erred by determin-

4. In addition, Ambulance Service's defense was that it did not breach its duty to Mr. Morrison, and the jury was presented with conflicting evidence regarding whether Mr. Morrison escaped through the front or rear door of the ambulance. Since the door from which he escaped is indicative of whether Ambulance Service was actually transporting Mr. Morrison in the manner it claims, the disputed evidence was properly admitted because it concerned the weight and credibility to be afforded the testimony of Ambulance Service's witnesses.

ing that a new trial was warranted merely because evidence was irrelevant to causation when that evidence was offered to prove a breach of a duty.

## ORDER

AND NOW, this 29th day of May, 1992, the order of the Court of Common Pleas of Allegheny County is reversed.

SILVESTRI, Senior Judge, dissenting.

On July 29, 1986, Mrs. Morrison's husband, George Morrison, was being transported by Schleifer's Ambulance Service (Schleifer) from a police station in Rankin, Pennsylvania to Woodville State Hospital (Woodville), a hospital operated by the Department of Public Welfare, Office of Mental Health (OMH). Mr. Morrison was a mental health patient at Woodville and was on a brief visit home when he began to hallucinate and became violent. Officer Mudd, the local Chief of Police, transported Mr. Morrison from his home to the police station and OMH arranged for Schleifer to transport him from the police station to Woodville. While the ambulance was traversing the Fort Pitt Bridge (Bridge) north to south across the Monongahela River, Mr. Morrison forced his way out of the ambulance, ran a short distance and fell over the railing of the Bridge to his death. Mrs. Morrison filed a wrongful death and survival action against OHM, J.P. Harika, M.D.[1] and Schleifer alleging, *inter alia,* that Schleifer was negligent by failing to assess Mr. Morrison's condition; failing to restrain, control and watch him; allowing him to escape the ambulance; and failing to remain at the scene to assist the rescue squad. It is this last contention of the plaintiff which is at the crux of this appeal.

The jury returned a verdict in favor of the plaintiff. Following a post-trial relief motion by Schleifer seeking judgment notwithstanding the verdict and a new trial, the trial court

1. Mrs. Morrison settled with OHM and Dr. Harika prior to trial and executed a joint tort-feasor release.

granted a new trial[2] and this appeal by the plaintiff followed. The majority reverses the trial court's grant of a new trial; I would affirm, and therefore dissent.

The trial court based its grant of a new trial on the ground that it committed error in permitting, over the objection of Schleifer, testimony as to the events which occurred *after* plaintiff's decedent fell over the railing of the Bridge to his death.

The only evidence as to what transpired after the plaintiff's decedent fell over the Bridge was that of the driver of the ambulance, Bernard J. Jozwiak (Jozwiak), and his assistant, John C. Fritzius (Fritzius), William Fike, who was near the shoreline of the Monongahela River underneath the Bridge, and Theodore J. Schleifer, owner of the ambulance.

Before setting forth the testimony of the aforesaid persons, it is necessary to describe the layout of the Bridge. The Bridge crosses the Monongahela River in a north-south direction with its northerly terminus near what is commonly referred to as Point State Park, which lies between downtown Pittsburgh and the junction of the Allegheny and Monongahela Rivers. The Bridge consists of two levels, each level bearing one-way vehicular traffic. The first level or lower level is for southbound traffic, carrying traffic, not only out of downtown Pittsburgh, but also from the Parkway East, and from the northerly section of the City of Pittsburgh (City) over the Fort Duquesne Bridge, which crosses the Allegheny River.

As traffic crosses the Bridge and approaches the south end, there are lanes to the right for traffic going to the westerly section of the City; also there are lanes to proceed straight ahead through a tunnel, then into the South Hills section of the City.

The second level, or the upper level, of the Bridge is also one-way traffic across the Bridge for northbound traffic. Traffic on the upper level comes from another tunnel, connect-

---

2. Schleifer's motion for judgment notwithstanding the verdict was denied by the trial court.

ing the South Hills and the City, and also from a ramp for traffic from the westerly section of the City. At the northerly end of the Bridge, traffic by way of ramps may go directly on to the Parkway East, or to the Fort Duquesne Bridge, or to the downtown section of the City.

There is a sidewalk on the westerly side of the lower level of the Bridge. There is no area for vehicles to pull off to the side of the Bridge in order not to impede the flow of traffic. There are no emergency telephones on either the upper or lower level of the Bridge;[3] neither is there evidence that the ambulance was equipped with a radio or a telephone.

The evidence as to what transpired after the plaintiff's decedent fell over the Bridge rail of the lower level of the Bridge is as follows.

Within seconds after the fall the two attendants who were pursuing plaintiff's decedent looked over the railing for signs of decedent and for sources of help. [Tr. 330a–31a (Fike)]. The source of possible help which they could see was people in a boat and they sought to get their attention but these people interpreted their waving as simply a friendly greeting. [Tr. 80a (Jozwiak)]. Traffic on the bridge was stop and go, bumper to bumper. Horns were blowing and brake lights were flashing. [Tr. 332a (Fike)]. The Fort Pitt Bridge is a very complex, multi-tiered, extremely high volume structure. There was no place to pull over and park. There was no way for the attendants to get down to the area where the plaintiff's decedent went into the river. The attendants did not have a radio or any means of outside communication in the ambulance so they went to the nearest telephone. [Tr. 174a (Fritzius)].

**3.** The Bridge layout, as herein relevant, is by way of judicial notice which allows courts to dispense with the formal rigors of evidentiary proof regarding matters so well known and notorious throughout the community that even courts should not be ignorant of them until proven. *See Department of State v. Stecher,* 506 Pa. 203, 484 A.2d 755 (1984); *Appeal of Albert,* 372 Pa. 13, 92 A.2d 663 (1952); *Abbruzzese v. Board of Probation and Parole,* 105 Pa.Commonwealth Ct. 415, 524 A.2d 1049 (1987); *Snipas v. Commonwealth,* 46 Pa.Commonwealth Ct. 196, 405 A.2d 1366 (1979).

The nearest telephone required traveling south the length of the bridge and through the Fort Pitt tunnel. [Tr. 81a–83a (Jozwiak)]. At the south end of the tunnel there was an emergency station. The ambulance personnel went to the emergency station, identified themselves to the Bridge attendant and told him what had happened. [Tr. 83a (Jozwiak)]. The Bridge attendant got on the telephone and dialed 911. [Tr. 83a (Jozwiak)]. After Fritzius identified himself and told the 911 people what happened they said: "Okay, we'll take over." [Tr. 179a (Fritzius)]. There was no evidence at trial to rebut this telephone call or the instructions of the 911 authorities to the two attendants.

While Fritzius was waiting for the Bridge attendant to get 911, he instructed Jozwiak to call Theodore J. Schleifer, their boss and owner of the ambulance service. [Tr. 83a (Jozwiak)]. Jozwiak called Schleifer. [Tr. 83a (Jozwiak)]. Schleifer instructed the attendants to come back to the base because it was in the hands of the police at that time. [Tr. 84a (Jozwiak); Tr. 164a (Fritzius)]. Schleifer then proceeded to call 911 [Tr. 230a (Schleifer)] and told them what happened. He also called the Pittsburgh police. [Tr. 23a (Schleifer)]. The police notified the Pittsburgh paramedics who responded to the "jumper" call at approximately 2:30 p.m. to 2:40 p.m. [Tr. 125a (Peindl)]. The police sent no one to interview Schleifer [Tr. 231a (Schleifer)]. In fact the police gave no instructions for Schleifer, Jozwiak, or Fritzius to come to the station to be interviewed. [Tr. 231a (Schleifer)]. This was unrebutted at trial.

After the attendants reported the incident to their boss and 911, they proceeded back to their base through the northbound tunnel and onto the upper level of the Bridge. [Tr. 84a–85a (Jozwiak); Tr. 164a–165a (Fritzius)]. This time they were driving on the top deck over the lower deck where decedent fell. [Tr. 86a (Jozwiak)]. As they passed the area where plaintiff fell, Fritzius slowed the vehicle and both attendants looked out to see if there was any activity below. [Tr. 86a (Jozwiak); Tr. 166a (Fritzius)]. There was none. [Tr. 166a (Fritzius)]. The attendants arrived back at the

Schleifer base at approximately 3:30–3:45 p.m. [Tr. 71 (Jozwiak); Tr. 170a (Fritzius)]. They again told Schleifer everything that happened on the Bridge. [Tr. 87a (Jozwiak)].

Shortly after their return to their home base the attendants went to pick up an already-scheduled dialysis patient. [Tr. 178a (Fritzius)]. This patient was scheduled every week, three times a week. [Tr. 179a (Fritzius)]. The police had not contacted Schleifer, Jozwiak, or Fritzius before this scheduled run. [Tr. 179a (Fritzius)]. After their delivery of the dialysis patient, they returned to base at an undisclosed time. At approximately 5:30–6:00 p.m., they were asked to go to the police station to make out a report which they did. [Tr. 231a–32a (Schleifer)].

The Pittsburgh police were first notified of the incident at approximately 3:30–3:45 p.m. [Tr. 104a–05a (Steinmetz)]. Approximately two hours after their initial scene investigation, they interviewed the two attendants. [Tr. 106a (Steinmetz)]. The police never claimed that the attendants' leaving the scene hampered their investigation. [Tr. 118a (Steinmetz)].

The trial judge, in his opinion, wrote:

Accepting the medical opinion that the death of Morrison was caused by blunt force trauma and drowning between two and six minutes after he hit the wooden dock our reason tells us that death occurred even before the telephone call was made. However, the important consideration from the standpoint of the law is not what reason tells us but rather, as stated heretofore, that there is no evidence that Morrison could have been saved after he fell.

(Opinion, pp. 3–4.)

At page 5 of the opinion, the trial judge characterized the conduct of both counsel and witness for the plaintiff as follows:

Nevertheless, the conduct of Schleifer which was most forcefully and repeatedly condemned by both counsel and witnesses for the Plaintiff was returning to their workplace and at a later hour handling a dialysis case which had been scheduled for the same day. After alerting the emergency services as has been stated, the attendants telephoned to

Theodore Schleifer, the owner of Schleifer Ambulance Service, and when they had reported everything that happened they were told to return to their base.

The owner of Schleifer was castigated in the strongest terms for not instructing his men to go back to the bridge so that any rescue squad would be told where to look for Morrison. The argument even suggested that he might be found alive despite the admissions and evidence to the contrary. Permitting this despite numerous objections, beginning with a motion in limine, was a very serious trial error. The action of Schleifer in this respect was represented as cold and callous indifference to life and it probably was ill advised from the viewpoint of conventional opinion, but it did not contribute to the death of Morrison. The error in permitting the representation of the contrary requires a new trial.

The trial judge concluded his opinion (p. 6) by stating, "a new trial will have to be granted because of the highly prejudicial error in admitting evidence of alleged fault of Schleifer after the fall."

The issue before us is whether the trial court abused its discretion or committed an error of law in granting Schleifer a new trial for the reasons set forth in its opinion and quoted *supra.*

The rule relating to the review of the grant of a new trial is stated by the Supreme Court in *Kralik v. Cromwell,* 435 Pa. 613, 258 A.2d 654 (1969) as follows:

The grant of a new trial lies within the inherent power of a trial court, and on appeal we will not interfere with the exercise thereof, unless there has been a clear abuse of discretion or an error of law which necessarily controlled the grant of the new trial. *Getz v. Balliet,* 431 Pa. 441, 246 A.2d 108 (1968). Moreover, as we stated in *Clewell v. Pummer,* 388 Pa. 592, 598, 131 A.2d 375, 378 (1957), and recently reaffirmed in *Getz v. Balliet, supra,* "Where a trial Judge or Court sees and hears the witnesses, it has not only an inherent fundamental and salutary power, but it is its duty, to grant a new trial when it believes the verdict was

capricious or was against the weight of the evidence and resulted in a miscarriage of justice." However, it is error for the trial court to grant a new trial merely because it believes the jury should have returned a different verdict. *Eisert v. Jones,* 408 Pa. 73, 182 A.2d 717 (1962). Also, a trial court should give its reasons for the grant of a new trial, and its statement of the mere conclusion that the interests of justice require it is not sufficient to sustain such an order. *Beal v. Reading Company,* 370 Pa. 45, 87 A.2d 214 (1952), and *Bellettiere v. City of Philadelphia,* 367 Pa. 638, 81 A.2d 857 (1951).

In *Garrett's Estate,* 335 Pa. 287, 6 A.2d 858 (1939), the Supreme Court set forth the standard as to what constitutes an abuse of discretion as follows:

In reviewing the exercise of discretionary power, it is impracticable to lay down a general rule that will determine when such a petition should be granted and when it should be refused. The circumstances of the particular case must control. When the court has come to a conclusion by the exercise of its discretion, the party complaining of it on appeal has a heavy burden; it is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of discretionary power. "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused." *Mielcuszny et ux. v. Rosol,* 317 Pa. 91, 93, 94, 176 A. 236, 237 (1934).

The opinion of the trial court does not contain either a statement or conclusion, directly or indirectly, that its grant of a new trial was because the pre-jump evidence alone would not support a verdict for the plaintiff. To the contrary, the trial court, at pages 2 and 3 of its opinion, wrote as follows:

According to this expert testimony before transporting a mental patient an attendant should never rely upon what

seems obvious but has a duty to learn the behavioral characteristics of the subject, even if the acquisition of such knowledge would require talking to a professional who has been treating the subject. Unless it is determined clearly that the subject is not assaultive or suicidal, shackles must be used. It could be said that the thrust of this testimony was in effect that an ambulance service is a guarantor of the safe delivery of a mental patient. Consequently, when Morrison excaped [sic] from the ambulance and committed suicide, this expert testimony made a jury question of the alleged negligence of Schleifer regardless of contrary testimony of experts for the defense.

The post-jump evidence of the conduct of Schleifer and his two employees, did not precipitate the plaintiff's decedent's escape from the ambulance; neither did such evidence, as conceded by the plaintiff's decedent's representatives at trial, cause the death of Mr. Morrison.

The predicate of the trial court's grant of a new trial is, as hereinabove quoted from its opinion, that counsel and witnesses for plaintiff's decedent "most forcefully and repeatedly condemned" Schleifer and that Schleifer "was castigated in the strongest terms for not instructing his men to go back to the bridge." The action of Schleifer in this respect was represented as "cold and callous indifference to life."

At page 3 of the trial court's opinion, it is stated:

It is agreed of record in this case that there is no evidence that Morrison would have survived or that he could have been rescued and revived after his fall. In fact, the evidence which exist [sic] is very much to the contrary.

The trial court, after noting that counsel in their argument suggested that Mr. Morrison might be found alive despite the admission and evidence to the contrary, stated, "Permitting this despite numerous objections was a very serious error" and that in permitting the plaintiffs in their argument to represent that Mr. Morrison may have been saved after having agreed on the record to the contrary required a new trial. (See opinion, p. 5.)

It is not our function to substitute our judgment for that of the trial court when the trial court, as here, exercises its discretion to grant a new trial. Before we can reverse a trial court's discretionary grant of a new trial, it must be demonstrated that the trial court abused its discretion as defined in *Garrett's Estate*. Neither counsel for plaintiff's decedent nor the majority point to anything which constitutes an abuse of discretion. The trial judge presided over the trial, saw and heard the witnesses on examination and cross-examination by counsel, and heard the arguments and summations of counsel. The trial court was in the best position to determine the impact of how counsel and witnesses for the plaintiff's decedent characterized, argued and presented the post-jump testimony. Clearly, the trial court, on the record before us, did not commit an abuse of discretion.

The majority holds that the trial court committed an error of law by granting a new trial. The majority acknowledges at page 1087 of its opinion that the post-jump evidence did not go to causation and then argues in Mrs. Morrison's behalf that "her burden was to convince the jury that Ambulance Service's failure to provide trained ambulance crew was the proximate cause of Mr. Morrison's death. Thus, the evidence in dispute was properly offered to prove the material fact that Ambulance Service failed to conform to local and national standards of conduct by not providing trained attendants." However, the majority does not elucidate what it was that made the post-jump conduct the proximate cause of Mr. Morrison's escape from the ambulance nor, considering the post-jump conduct vis-a-vis the physical layout of the Bridge, are we told what the local and national standards were, and the nature and extent of the non-conformance therewith.

Because the trial court's grant of a new trial was predicated on the manner and conduct of plaintiff's counsel and witnesses in the use of the post-jump evidence, even assuming arguendo the majority is correct that the post-jump evidence was admissible, the trial court neither abused its discretion nor committed an error of law in granting a new trial.