646 A.2d 565

**Shirley A. MORRISON, Administratrix of the Estate of George Morrison, Deceased,**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE, OFFICE OF MENTAL HEALTH (WOODVILLE STATE HOSPITAL), Schleifer Ambulance Service, and J.P. Harika, M.D.**

**Appeal of SCHLEIFER AMBULANCE SERVICE.**

Supreme Court of Pennsylvania.

Argued March 8, 1994.

Decided Aug. 25, 1994.

Louis C. Long, Daniel C. Lawson, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Esther Joy Schwartz, Chicago, IL, for appellant.

Samuel J. Cordes, Michael A. Murphy, Ogg, Jones, DeSimone & Ignelzi, Pittsburgh, for Shirley Morrison.

Robert S. Andrews, Jr., Deputy Atty. Gen., for Com., Dept. of Public Welfare, Office of Mental Health.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

Schleifer Ambulance Service appeals from an order of the Commonwealth Court reversing the order of the Court of Common Pleas granting Schleifer's motion for a new trial. We find that the Commonwealth Court applied an incorrect standard of review and erred in reversing the trial court's decision. Accordingly, we reverse the decision of the Commonwealth Court and reinstate the order of the Court of Common Pleas.

George Morrison, the husband of Appellee Shirley Morrison, was a mental health patient at Woodville State Hospital. On July 29, 1986, while Mr. Morrison was on a brief visit home, he began to hallucinate and became violent. Mrs. Morrison requested that her husband be returned to Woodville. The Office of Mental Health ("OMH") arranged for the local Chief of Police to transport Mr. Morrison from his home

to the police station, and for Appellant Schleifer Ambulance Service ("Schleifer") to transport Mr. Morrison from the police station to Woodville. During Schleifer's transport, while the ambulance was crossing the Fort Pitt Bridge over the Monongahela River, Mr. Morrison escaped from the ambulance, ran to the railing at the side of the bridge, and fell over the railing to his death.

Mrs. Morrison filed wrongful death and survival actions against the defendants [1] alleging that their negligence caused the death of her husband. With respect to Appellant Schleifer, she alleged that the ambulance service was negligent in failing to assess Mr. Morrison's condition; failing to restrain, control and monitor him; allowing him to escape from the ambulance; and failing to remain at the scene of the accident to assist the rescue squad.

Before trial, Schleifer filed a motion in limine to preclude Mrs. Morrison from introducing evidence that the ambulance crew failed to remain at the scene of the accident. Schleifer asserted that the attendants' leaving the scene did not affect their ability to assist Mr. Morrison, because they could have done nothing to help him after he fell. Schleifer argued that any probative value the evidence might have was outweighed by its prejudicial effect, as the evidence would serve only to inflame the jury and evoke sympathy against Schleifer. Mrs. Morrison argued, to the contrary, that the evidence of abandonment was admissible because it was probative of the ambulance crew's lack of proper training and showed a continuous course of negligent conduct. The trial court denied the motion in limine.

At trial, Mrs. Morrison called several witnesses, including the ambulance attendant, Bernard J. Jozwiak, and the ambulance driver, John C. Fritzius. The two men testified regarding the extent of their training in transporting mental health patients, described their pick-up and transport of Mr. Morrison, and recounted the accident and their activities after it happened. They testified that Mr. Morrison had been sitting

---

1. Mrs. Morrison settled with the Office of Mental Health and Dr. Harika prior to trial and executed a joint tortfeasor release.

in the back of the ambulance with Mr. Jozwiak. While Mr. Jozwiak was distracted, enjoying the view from the Fort Pitt Bridge, Mr. Morrison climbed into the front passenger seat and escaped through the passenger side door. Mr. Jozwiak followed Mr. Morrison through that door and chased him, but Mr. Morrison ran over to the railing and fell off of the bridge. The ambulance crew "heard a thud" (Testimony of Bernard J. Jozwiak, Reproduced Record at 80a) and ran to the railing. They could not see Mr. Morrison, but they did see a boat in the river with a couple of fishermen on board. Fritzius and Jozwiak tried to signal to the men on the boat, but the men apparently thought they were merely waving in greeting and did not stop. Because there was nowhere to stop on the bridge, no telephone was available before the tunnel, and the ambulance was not equipped with a two-way radio, the crew decided to return to the ambulance and drive through the tunnel to a garage at the end of the tunnel. With the help of a mechanic there, Fritzius called "911" and reported the accident to an operator who said "okay, we'll take over." (Testimony of John C. Fritzius, R.R. at 179a.) Jozwiak then called their employer, Theodore J. Schleifer, who instructed the crew to return to the base. After returning to the base, the crew transported another patient who had been scheduled for dialysis that afternoon. Later that day Schleifer, Fritzius and Jozwiak went to the police station to complete a report.

Mrs. Morrison also presented the testimony of William Fike, an electrician who had been working on a temporary dock with a view of the bridge when the accident occurred. Mr. Fike testified that from the corner of his eye he saw an object fall, and then he heard a thud as the object hit the edge of the dock and a splash as it hit the water. He looked up and saw the ambulance on the bridge and the two crew members looking over the railing. Mr. Fike stayed on the dock for approximately fifteen minutes, but did not see anything float to the surface of the water.

Both parties presented expert testimony regarding local and national standards of care. The experts' opinions conflicted as to whether the ambulance crew had been properly trained,

had properly assessed Mr. Morrison before transporting him, and had properly transported him, as well as whether they had violated the standard of care by leaving the scene of the accident.

Schleifer presented the videotaped deposition testimony of Dr. Paul M. Paris, who testified that Mr. Morrison had died as the result of a forceful blow to the head, which knocked him unconscious, followed by drowning. Dr. Paris stated that it was "extraordinarily unlikely" (R.R. at 1244a) that Mr. Morrison would have survived, even if the river rescue squad had been able to reach him in a matter of seconds.

The court's instructions to the jury at the close of the evidence included the following statement:

Now, then, there's also a sharp conflict about the conduct of the two attendants in this vehicle in not having one or more of them remain at the scene so that when the river patrol would show up they could point to where the deceased went down into the water, or he fell from the bridge or jumped from the bridge, whichever it would be. . . . Of course, if you were to determine that it wouldn't have saved the deceased's life, in other words, that it wouldn't have done any good for the ambulance driver to remain if in fact he died from the blow on the head so quickly, then, of course, their failure to remain, whether right or wrong, wouldn't have anything to do with his death.

(R.R. at 931a.) The jury returned a verdict for Mrs. Morrison, finding 75% of the causal negligence attributable to Schleifer, 25% attributable to OMH, and none attributable to Mr. Morrison. The jury awarded $450,000 in damages.

The trial court granted Schleifer's motion for a new trial, finding that it had committed "very serious trial error" in permitting evidence and argument regarding the ambulance crew's conduct following the accident. The court noted that the ambulance crew had decided to drive through the tunnel to telephone for help because they could not have gotten down to the dock to help Mr. Morrison. The court also noted that no evidence had been presented that Mr. Morrison could have

survived his fall, and that the evidence that was presented indicated the contrary. The court went on to state:

> Nevertheless, the conduct of Schleifer which was most forcefully and repeatedly condemned by both counsel and witnesses for the Plaintiff was returning to their workplace and at a later hour handling a dialysis case which had been scheduled for the same day. . . .
>
> The owner of Schleifer was castigated in the strongest terms for not instructing his men to go back to the bridge so that any rescue squad would be told where to look for Morrison. The argument even suggested that he might be found alive despite the admissions and evidence to the contrary. Permitting this despite numerous objections, beginning with a motion in limine, was a very serious trial error. The action of Schleifer in this respect was presented as cold and callous indifference to life and it probably was ill advised from the viewpoint of conventional opinion, but it did not contribute to the death of Morrison. The error in permitting the representation of the contrary requires a new trial.

(Trial Court Opinion at 5.) Although the court referred to a second issue raised by Schleifer,[2] the court found resolution of that issue to be unnecessary because the admission of the abandonment evidence alone was a sufficient basis for granting a new trial. (*Id.* at 6.)

On appeal, a panel of the Commonwealth Court reversed in a 2–1 decision. *Morrison v. Commonwealth, Dept. of Public Welfare,* 148 Pa.Commw.Ct. 245, 610 A.2d 1082 (1992). The majority disagreed with Schleifer's characterization of the issue on appeal as being whether the trial court abused its discretion in granting a new trial, where the basis of that decision was the trial court's discretionary ruling that the abandonment evidence should have been excluded. Instead, the court framed the issue as "whether the reason the trial court gave for granting a new trial was in itself an error of

---

**2.** That issue was whether the trial court erred in instructing the jury that Schleifer was acting as a common carrier for hire and therefore was required to exercise the highest degree of care.

law." *Id.* at 252, 610 A.2d at 1086. More specifically, the court determined that the issue was "whether, in a negligence case, evidence which is offered to prove breach of a duty need also be probative of causation to be relevant and therefore admissible." *Id.*, 610 A.2d at 1086. The court went on to find that the abandonment evidence, though not relevant to causation, was relevant and admissible to prove that Schleifer had failed to conform to local and national standards of conduct by not providing properly trained attendants.[3] The court further determined that any prejudice to Schleifer was sufficiently cured by the trial court's instruction to the jury that, if Mr. Morrison died as a result of the head injury, the crew's failure to remain at the scene did not cause his death. Accordingly, the court held that the trial court had erred in granting a new trial.[4]

Senior Judge Silvestri dissented. He pointed out that the trial court's decision was based upon the manner in which plaintiff's counsel and witnesses had used the disputed evidence, and that the trial court was in the best position to determine the impact of the way the evidence was presented and argued. Judge Silvestri therefore found that the trial court had neither abused its discretion nor committed an error of law.

This Court granted Schleifer's petition for leave to appeal. On appeal to this Court, Schleifer contends that the Commonwealth Court applied an incorrect standard of review in reversing the trial court's order. We agree. The Commonwealth Court majority stated that it was to examine the trial court's decision to determine "whether the reason the trial

**3.** The court also noted that the jury had heard conflicting testimony regarding which door Mr. Morrison had exited (for example, William Fike testified that he saw the back door open, while the ambulance crew testified that the back door was closed) and, to that extent, the disputed evidence was relevant to the weight and credibility to be assigned the ambulance crew's testimony. 148 Pa.Commw.Ct. at 254 n. 4, 610 A.2d at 1087 n. 4.

**4.** With regard to the common carrier issue raised by Schleifer in post-trial motions, see note 2, *supra,* the court found that even if characterizing Schleifer as a common carrier was error, it was harmless error. 148 Pa.Commw.Ct. at 254 n. 3, 610 A.2d at 1085 n. 3.

court gave for granting a new trial was in itself an error of law." 148 Pa.Commw.Ct. at 252, 610 A.2d at 1086. That statement reflects a basic misunderstanding of the standard that is to be applied in reviewing a trial court's decision to grant a new trial. The misunderstanding appears to have originated from confusion regarding this Court's articulation of the scope and standard of review of a trial court's decision to grant a new trial. Therefore, we will examine the source of confusion and then explain the proper application of the scope and standard of review.

"Scope of review" and "standard of review" are often—albeit erroneously—used interchangeably. The two terms carry distinct meanings and should not be substituted for one another. "Scope of review" refers to "the confines within which an appellate court must conduct its examination." *Coker v. S.M. Flickinger Company, Inc.*, 533 Pa. 441, 450, 625 A.2d 1181, 1186 (1993). In other words, it refers to the *matters* (or "what") the appellate court is permitted to examine. In contrast, "standard of review" refers to the *manner* in which (or "how") that examination is conducted. In *Coker* we also referred to the standard of review as the "degree of scrutiny" that is to be applied. *Id.*, 625 A.2d at 1186.

In *Coker*, this Court reaffirmed the "fundamental and longstanding precept that the decision to order a new trial is one that lies within the discretion of the trial court." 533 Pa. at 447, 625 A.2d at 1184. Thus, the *standard* for appellate review of such a decision is always an abuse of discretion standard. In contrast, the *scope* of the appellate court's review of the trial court's decision varies: It is determined by whether the trial court cites a finite set of reasons for its decision, indicating that but for the cited reasons it would not have granted a new trial, or "leaves open the possibility that it would have ordered a new trial for reasons other than those it specified." *Id.* at 446, 625 A.2d at 1184. If the trial court leaves open the possibility that reasons additional to those specifically mentioned might warrant a new trial, or orders a new trial "in the interests of justice," the appellate court

applies a broad scope of review, examining the entire record for any reason sufficient to justify a new trial. *Id.* at 448, 625 A.2d at 1185. However, if, as in this case, the trial court "indicates that the reasons it gives are the only basis for which it ordered a new trial[,] . . . an appellate court can only examine the stated reasons." *Id.* at 449, 625 A.2d at 1185.[5]

We have in the past referred to the latter, more narrowly focused review as being an inquiry into the "legal merit" of the specified reasons. *See, e.g., Keefer v. Byers,* 398 Pa. 447, 159 A.2d 477 (1960). However, as we noted in *Coker,* our use of this term appears to have caused confusion in the intermediate appellate courts, which misunderstood it to mean that the degree of scrutiny, or standard of review, applied to the trial court's decision varies depending upon the number of reasons cited by the trial court. That is, the intermediate appellate courts interpreted an inquiry into the "legal merit" to be a more penetrating review than an abuse of discretion review. The Commonwealth Court in the case *sub judice,* in particular, apparently believed that, in all cases where the trial court cites just one reason or a finite set of reasons for its decision, the cited reasons are converted into issues of law that the appellate court is to review *de novo.* In *Coker,* however, we emphasized that it is the *scope* of review, and not the *standard* of review, that varies:

> [The] two procedures . . . differ only in terms of the confines within which an appellate court must conduct its examination. . . . The degree of scrutiny does not vary when an appellate court reviews an order granting a new trial.

*Id.* 533 Pa. at 450, 625 A.2d at 1186. We also explained that, when viewed in terms of the degree of scrutiny that should be applied, an inquiry into an abuse of discretion is opera-

**5.** The scope of review is narrowed in such a case to enable the appellate court to perform its review function without improperly interfering with the trial court's discretionary power to order a new trial. "[T]he overriding concern is that an appellate court refrain from ordering a retrial where the trial court would not have done so." See discussion at *id.* 533 Pa. at 451–452, 625 A.2d at 1186–87.

tionally equivalent as [sic] one into the merit of the trial court's decision.

*Id.* at 448, 625 A.2d at 1185. Therefore, the ultimate question to be answered on appellate review of a trial court's decision to grant a new trial is always whether the trial court abused its discretion.[6]

Having clarified the difference between the scope of review and the standard of review of a trial court's decision to grant a new trial, we now turn to a discussion of the proper application of these concepts. It is important to recognize that the trial court's decision whether to grant a new trial rests on its preliminary or predicate decision as to whether any reasons exist for granting a new trial. In other words, there are two levels to a trial court's decision whether to grant a new trial: First, the court must determine whether, colloquially speaking, a "mistake" (or mistakes) was made at trial. Second, the court decides whether the mistake (or mistakes) is sufficient basis for granting a new trial.[7] The first decision—whether a mistake was made—may involve factual, legal, or discretionary matters. However, the second and ultimate decision—whether to grant a new trial—is always a discretionary matter because it requires consideration of the particular circumstances of the case.

An appellate court reviewing the decision to grant a new trial, therefore, essentially reviews that decision at two levels. First, it examines the trial court's underlying decision as to whether a mistake was made. Where the trial court articulates a single mistake (or a finite set of mistakes), the appellate court's review is limited in scope to the stated reason, and the appellate court must review that reason under the appropriate standard. Thus, if the trial court's stated reason is based upon a discretionary matter, the appellate

---

**6.** Given the extent to which our use of the term "legal merit" has confused the bench and bar, we now abandon the use of that term. Any special significance that may have been attached to this term was not intended.

**7.** Of course, if the trial court's answer to the first question is "no," it should answer the second question in the negative as well.

court is not required or permitted to distill that basis down to a purely legal question as the Commonwealth Court in the case *sub judice* believed it was bound to do; the matter must be reviewed for an abuse of discretion. On the other hand, if a stated reason is purely a question of law, it is reviewed as such.[8] If the appellate court determines that the trial court reached an erroneous decision at this level, then there is no basis for the grant of a new trial and the appellate court may reverse.[9]

If the appellate court finds that the trial court neither abused its discretion nor committed an error of law in finding that mistakes were made, it reviews the decision to grant a new trial by applying an abuse of discretion standard. The appellate court's inquiry at this level is to be focused on whether the trial court's stated reasons and factual basis find support in the record. *Coker,* 533 Pa. at 452, 625 A.2d at 1187; *Childs v. Austin Supply Co.,* 408 Pa. 403, 406, 184 A.2d 250, 252 (1962). "Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Coker,* 533 Pa. at 453, 625 A.2d at 1187. *See also Westinghouse Elevator Co. v. Herron,* 514 Pa. 252, 259, 523 A.2d 723, 727 (1987); *Thompson v. City of Philadelphia,* 507 Pa. 592, 599–600, 493 A.2d 669, 673 (1985). In considering whether the record supports the trial court's decision, the appellate court is to defer to the judgment of the trial court, for the trial court is uniquely qualified to determine factual matters. Further, an abuse of discretion occurs not merely when the trial court reaches a decision contrary to the decision

8. For example, in cases where the cited reason for granting a new trial was the supposed inaccuracy or inadequacy of jury instructions, we have reviewed the trial court's decision as a matter of law. *See, e.g., Adams v. Scheib,* 408 Pa. 452, 184 A.2d 700 (1962); *Childs v. Austin Supply Co.,* 408 Pa. 403, 184 A.2d 250 (1962); *Keefer v. Byers,* 398 Pa. 447, 159 A.2d 477 (1960).

9. Thus, in *Childs* and *Keefer,* cited in note 8, this Court reversed the trial court's decision to grant a new trial because we found that no mistake had been made at trial. *See Childs,* 408 Pa. 403, 184 A.2d 250 (no mistake because instruction was adequate and proper); *Keefer,* 398 Pa. 447, 159 A.2d 477 (no mistake because counsel did not submit requested point for charge and its omission in absence of such request did not constitute basic and fundamental error).

that the appellate court would have reached. Rather, an abuse of discretion occurs

> when the course pursued represents not merely an error of judgement, but where the judgement is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Coker,* 533 Pa. at 447–448, 625 A.2d at 1185 (quoting P.L.E. New Trial § 2).[10]

 We find that the Commonwealth Court failed to apply the proper scope and standard of review in the instant case. First, as discussed above, the Commonwealth Court erroneously converted the trial court's stated basis for granting a new trial into a pure question of law, when it is plain that the trial court's decision rested upon discretionary matters. The trial court expressly stated that it granted a new trial because the disputed evidence should have been excluded as being unduly prejudicial to Schleifer and because the manner in which plaintiff used the evidence further prejudiced Schleifer. It is well established that both of these determinations were within the trial court's discretion: This Court has repeatedly stated that the admission or exclusion of evidence lies within the discretion of the trial court. *Commonwealth v. Hart,* 479 Pa. 84, 87, 387 A.2d 845, 847 (1978) (collecting cases). We also have stated that whether counsel's argument is appropriate is a matter primarily to be decided by the trial judge, who is present and therefore in the best position to assess the manner of presentation and effect on the jury. *See, e.g., Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 184, 191 A.2d 662, 671 (1963). *Cf. Thompson, supra,* 507 Pa. at 599, 493 A.2d at 672–673 (trial court stands on different plane than appellate court because its decision is aided by "on-the-scene evaluation of the evidence," while appellate court reviews only the cold record). Similarly, the trial court was

10. Thus, in *Adams, supra,* while we agreed that a mistake had occurred at trial, we reversed the grant of a new trial because the trial court's factual basis found no support in the record where the party that received the benefit of the error did not prevail at trial. 408 Pa. at 463, 184 A.2d at 706.

the better judge of whether its instruction to the jury cured the prejudice.

Second, the Commonwealth Court's approach in reviewing the trial court's decision was contrary to the approach that this Court has mandated. Rather than reviewing the record to determine whether the trial court's reasons found support, the Commonwealth Court did the converse: It searched for an argument to counter the trial court's decision. This Court has expressly disapproved of such an approach, noting that it "begs the question before [the appellate court]; the question being whether the trial judge's reasons for his act in granting a new trial were justified." *Thompson, supra,* 507 Pa. at 601, 493 A.2d at 674. *See also Westinghouse Elevator Co. v. Herron, supra,* 514 Pa. at 259, 523 A.2d at 727.

Upon our review of the record, we find that the trial court did not abuse its discretion. First, the record shows that Schleifer objected to the disputed evidence throughout trial, beginning with its motion in limine. *See Coker,* 533 Pa. at 454, 625 A.2d at 1188 (requiring timely objection of counsel). Second, the record supports the trial court's reasoning that the post-jump evidence was not relevant to causation and that the manner in which it was presented was highly prejudicial.[11] The record shows that much attention at trial was focused on the ambulance crew's post-jump conduct. As the trial court observed, this evidence was used to portray the Appellant as being cold and callously indifferent to life, and to suggest that Mr. Morrison could have survived if the attend-

11. Even assuming that the Commonwealth Court was correct in finding that the disputed evidence was relevant to the issue of the ambulance crew's lack of proper training, it does not follow that the trial court abused its discretion in determining that the evidence should have been excluded. It is apparent from the trial court's ruling on the motion in limine that it recognized that the evidence might be relevant to the training issue. See R.R. at 32a–34a. However, the trial court's later decision to grant a new trial was based on its determination that the evidence was presented in a manner that suggested that it was relevant to causation, and therefore its admission unduly prejudiced Schleifer. We note, moreover, that plaintiff was given the opportunity to, and did, present a significant amount of other evidence (including expert testimony and the testimony of Schleifer's crew and owner) to support her contention that the attendants were not properly trained.

ants had not left the scene—*i.e.*, that the evidence *was* relevant to causation. Because the trial court's stated reasons find support in the record, and because the trial court was in the best position to assess the effect on the jury of the evidence and argument, the trial court cannot be found to have abused its discretion.[12]

Accordingly, we reverse the order of the Commonwealth Court and reinstate the order of the Court of Common Pleas.

PAPADAKOS, J., files a dissenting opinion.

MONTEMURO, J., is sitting by designation as Senior Justice pursuant to Judicial Assignment Docket No. 94 R1801, due to the unavailability of LARSEN, J., see No. 127 Judicial Administration Docket No. 1, filed October 28, 1993.

PAPADAKOS, Justice, dissenting.

Although I commend my colleague who has done a superb job in describing the differences between scope of review and standard of review and alerting the bench and bar not to interchange their use as though they are synonymous, I cannot join in the conclusion that the trial judge did not abuse his discretion in ordering a new trial. I must therefore dissent.

The gist of the majority opinion is that the trial judge committed "very serious trial error" in allowing into evidence the fact that the ambulance crew left the scene of the incident without staying to offer assistance. The majority and the trial judge are of the view that this evidence highly prejudiced the jury against the ambulance service. I think that the majority makes a mountain out of a molehill.

The evidence against the ambulance crew was overwhelming to establish their negligence in allowing the decedent, who was

12. Because we affirm the trial court's order on the basis of its stated reasons, we need not address the second issue presented by Schleifer—*i.e.*, whether the trial court erred in instructing the jury that Schleifer was a common carrier for hire. We note that the trial court did not resolve this issue on its merits, as the court found the admission of the disputed evidence to be sufficient basis for granting a new trial.

being taken to a mental institution, to jump out of the ambulance and over the railing to the river below. This fact alone was sufficient to support the verdict of the jury and the fact that the crew showed callousness or hard heartedness did not make the crew more negligent. At best, the introduction of this evidence was mere surplusage and constituted harmless error, if it was error.

If this evidence had not been introduced and the jury had brought in a verdict for the ambulance service, I believe that the conscience of the court would have been shocked and a new trial would have been granted to the plaintiff, the evidence of negligence against the ambulance service being so clear and convincing as to its negligence. I cannot believe that justice will not produce the same verdict in a new trial.

Since I believe that the evidence which offends the majority is, at most, harmless error, I respectfully dissent and would affirm the Commonwealth Court.