Kay SUMMERS, Appellee,

v.

GIANT FOOD STORES, INC., Hershocks, Inc., and Stanley Magic Door, Inc., a Division of the Stanley Works, Inc., Appellees,

v.

Microwave Sensors, Inc., Appellee.

Appeal of Giant Food Stores, Inc.

Kay Summers, Appellant,

v.

Giant Food Stores, Inc., Hershocks, Inc., and Stanley Magic Door, Inc., a Division of the Stanley Works, Inc., Appellees,

v.

Microwave Sensors, Inc., Appellee.

Superior Court of Pennsylvania.

Argued April 30, 1999.
Filed Dec. 17, 1999.

---

George B. Faller, Jr., Carlisle, for Giant Food Stores, Inc.

Mark Schwartz, Mechanicsburg, for Summers.

Jonathan F. Ball, Philadelphia, for Stanley.

Before McEWEN, President Judge, and CAVANAUGH, DEL SOLE, JOHNSON, HUDOCK, EAKIN, JOYCE, MUSMANNO, and ORIE MELVIN, JJ.

McEWEN, President Judge:

## I. PROCEDURAL POSTURE

¶ 1 These consolidated appeals[1] have been taken from the order which, following a jury verdict in favor of all defendants, Giant Food Stores, Inc. (hereafter "Giant"), Hershocks, Inc. (hereafter "Hershocks"), and Stanley Magic Door, Inc. (hereafter "Stanley"), granted, in part[2], the post-trial motion of the plaintiff, Kay Summers (hereafter "Summers"), and ordered a new trial as to the defendant Giant

Food Stores, Inc., only.[3] Giant, as appellant in Appeal No. 637 Harrisburg 1997, challenges the award of a new trial against it, while Summers, as appellant in Appeal No. 708 Harrisburg 1997, challenges the denial of her request for a new trial as to defendant Stanley.[4] For the reasons set forth hereinafter, we reverse the order which awarded a new trial as to defendant Giant only, and remand for entry of judgment on the verdict of the jury.

## II. FACTS

¶ 2 The trial court provided the following summary of the evidence introduced at trial:

On Saturday evening, March 31, 1990, plaintiff Kay Summers purchased groceries at defendant Giant Food Stores' supermarket on 29th Street in Harrisburg. Her friend, Debra Shaw, proceeded ahead with the grocery cart. Plaintiff suffers from cerebral palsy and had recently undergone knee surgery and walked with the assistance of a cane. Plaintiff testified that while exiting an interior set of automatic sliding doors, they closed on her shoulders and immediately reopened, throwing her backwards onto the floor where she struck her head and back. She stated that she had approached the doors in the middle and that when she was an arm's length away, they opened full width. She placed her cane in the doors' threshold and stepped forward with her right leg. The doors closed just as she was beginning to move her left leg forward. She stated she was continuing to move through the doors and did not hesitate or stop. She described the speed of her gait as both

---

1. These appeals were consolidated by order of this Court, entered on December 29, 1997.

2. Summers' post-trial motions sought a new trial as to all defendants. However, the trial court ordered a new trial solely as to Giant.

3. Prior to trial, Summers reached a settlement agreement with respect to the claim

against additional defendant, Microwave Sensors, Inc.

4. Subsequent to trial, Summers reached a settlement agreement with respect to the claim against Hershocks, leaving Stanley and Giant as the sole remaining defendants.

normal "like any other person's" as well as normal for that of a person with cerebral palsy. Upon falling, she felt immediate pain.

Plaintiff's friend testified that upon exiting the exterior exit doors, she looked back and saw plaintiff being helped from the floor. She stated plaintiff appeared to be in pain. She asked plaintiff what had happened and she replied "they closed on me." However, her friend did admit she had given a recorded statement to an insurance adjuster one and one-half years after the accident wherein she stated that plaintiff told her, immediately after the accident, the doors had caught her single-point cane and thrown her to her back when they released. An inspection of the doors four days after the accident found them to be working as they were designed.[1]

---

[1] The testimony did not indicate if the inspector walked through the door with a normal gait or as a person, disabled or elderly, walking slowly leading with a cane.

Plaintiff wanted to leave the store to get medical treatment, however, her friend persuaded her to remain to file an accident report. Plaintiff, with Ms. Shaw's assistance, went to the manager's office. Both testified that plaintiff was in too much pain to sit on a chair in the office, so she stood. Upon completion of the meeting, Ms. Shaw stated she walked in front of plaintiff down six steps, plaintiff using her as a brace.

Plaintiff was taken to Harrisburg Hospital where she was x-rayed and given pain medication. She was released with instructions to seek further medical attention on Monday. She saw her orthopedic doctor, David Joyner, that Monday. He admitted her to Harrisburg Hospital where she was placed in traction for two to three weeks. She continued to suffer from back and leg problems necessitating a month-long stay at a rehabilitation hospital in October of 1990. At trial, she alleged her pain was

still considerable and had altered her lifestyle tremendously.

The doors in question were manufactured by defendant Stanley Magic Door. They had been installed in Giant's 29th Street store in 1983 by defendant Hershocks, an exclusive distributor of Stanley products. The motion sensors originally purchased with the Stanley door package were StanRay motion sensors. In 1987, the StanRay sensors were replaced by an equivalent product manufactured by additional defendant Microwave Sensors.[2]

---

[2] In 1987, the entrance/exit area to the store was remodeled and the doors were reinstalled. The StanRay sensors were misplaced, however, since they were no longer on the market, Hershocks ordered Microwave's product. Microwave is not a party to this suit, having settled with plaintiff prior to trial.

Giant relied upon Hershocks to provide advice on proper maintenance of the doors as well as product improvements. Two mechanisms guide the doors' opening and closing: 1) two motion sensors and 2) a hold beam. The motion sensors were located on top of the door frame, one on the inside and another on the outside. They caused the doors to open upon detection of motion. They would remain open for one second after the motion detection ceased. The hold beam was mounted in the door, twenty-one inches off the ground, and sent a beam of light across the length of the doors' threshold which, when broken by an object such as a human body, would prevent the doors from closing. Once the beam was reconnected the doors would close one-half second later.

It was acknowledged by two Hershocks' employees as well as by Giant's corporate records from July 1986, that doors with motion sensors and a hold beam had a coverage gap. The doors could close on a person if that person had stopped in the threshold, thereby losing detection by the inside motion sensor, and if the beam would be unbroken by

passing between a person's legs. Alternatively, as testified to by a Hershocks' employee, the doors could also close if a person stopped in front of the open doors, with an undetected cane placed across the hold beam area in the threshold, causing the doors to close on the person's cane. Both Hershocks' employees testified that doors with motion sensors and a hold beam would not close on a person who was in continual motion through the doors.

In 1987, Stanley placed on the market a StanGuard, an infrared presence sensor which was designed to replace both the motion sensors and hold beam. The two Hershocks' employees testified that it was a superior product since, even if a person were stopped motionless in the threshold area, the doors would "sense" the person and not close on them. In 1987, Stanley sent Giant two safety alert bulletins notifying Giant of the availability of the StanGuard which would "deliver improved safety coverage" and "reduce the possibility of accidents". A StanGuard promotional video, shown to the jury, vividly depicted the sliding doors, with motion sensors and a hold beam, closing on the walker of a slowly moving elderly person as they moved through the doors. The price of installation was $245.

Giant did not recall receiving the bulletins although Stanley's records indicated that they had been mailed. A Hershocks' employee testified that he also informed Giant of the StanGuard presence sensor when the product first became available in 1987. In December 1987, Giant made renovations to its 29th Street store, installing two new entrance doors with StanGuard. However, Giant did not modify the exit doors with StanGuard technology.

Plaintiff's expert testified that the Stanley door package in the Giant store at the time of plaintiff's accident (a door with two motion sensors and a hold beam) did not provide adequate protection for a slow-moving segment of the population such as the elderly and the handicapped. He claimed no entrapment can occur in doors equipped with a presence sensor, and that such a device would have avoided this accident. He testified that presence sensors such as the StanGuard were available on the market between 1983 and 1987. In lieu of a presence sensor, such a door package should have been equipped with a sensor mat. He stated that motion sensors do not pick up the movement of a person walking at a rate of less than six feet per second.[5] He assumed that plaintiff here was moving below that rate or had stopped, causing the motion sensor to "lose" her and signaling the doors to close. When informed that plaintiff had testified that she walked through the doors at a normal pace, he asserted that she was not a good judge of her walking speed.[3]

---

[3] This testimony was creible. Plaintiff attempted to minimize her handicap: not uncommon for disabled people with self-pride and determination.

Plaintiff elicited testimony regarding the occurrence of seven substantially similar automatic door closings on Giant customers in its various stores involving the elderly or handicapped, and in one case, the very young.[4]

---

[4] During an evidentiary hearing, following numerous motions, volumes of accident reports involving automatic door closings on Giant customers in the surrounding geographical area were received. Seven were determined to be substantially similar.

Defendants noted that in none of the incidents was the type of door system indicated and none of the incidents caused serious injury (cuts, swollen arm,

---

**5.** Giant correctly notes that the trial court erred in stating that the minimal rate of speed required for motion sensor detection was **six feet** per second. Plaintiff's expert witness tes-

tified that the minimum rate of speed required for detection was **six inches** per second, which is a rate approximately equivalent to a speed of one-third of one mile per hour.

etc.). Giant also noted that in 1985, over twenty-five million customers used its stores and in 1986, over twenty-five million.

On January 31, 1997, following a five-day trial and one hour of deliberation, the jury found none of the defendants nor the additional defendant liable in negligence or strict liability.

¶ 3 Although not recounted in the opinion of the trial court, the record reveals that the defendants introduced evidence from a number of sources in an effort to establish that (1) Ms. Summers' trial testimony concerning the cause of her fall was inaccurate, and (2) Ms. Summers may have fallen, in the absence of any precipitating event, solely as a result of her pre-existing medical conditions, which included severe rheumatoid arthritis and cerebral palsy.

¶ 4 The threshold task of the jury as it undertook consideration of the question of liability was to resolve credibility issues. The defendants, in an effort to rebut the claim of Ms. Summers that the automatic doors closed on her, offered evidence to establish that Ms. Summers had previously fallen without any precipitating event when her left leg would suddenly give out without warning. Medical records introduced by the defense established that Ms. Summers had experienced prior episodes of uncontrollable shaking and spasticity which could last from one second to almost 15 minutes and had been sent by her physician to the emergency room for "seizure type jerking motions" in her legs only four months prior to her fall at the Giant supermarket. After cross-examination by defense counsel had seriously damaged her credibility [6], Ms. Summers conceded on redirect examination that she had suffered unexplained falls without any warning but claimed that "[b]efore the accident, I didn't

have as many falls or I wouldn't get as hurt as I do now."

¶ 5 Defense counsel also sought to attack Ms. Summers' version of how the accident occurred by pointing out that, while Ms. Summers had used the doors at Harrisburg Hospital and Harrisburg Airport on many occasions, those doors had never closed on her.[7]

¶ 6 While unable to offer any direct evidence to prove that the fall in the doorway at Giant had been caused by a loss of motor control in her left leg, the defense, both by effective cross-examination of Summers' witnesses and by the presentation of substantial circumstantial evidence, suggested that the fall in the doorway of the market had not been precipitated by the closing of the doors on the shoulders or the cane of Ms. Summers.

¶ 7 The parties vigorously disputed whether there was an unreasonable risk of harm created by the Stanley door package equipped with the motion sensors and threshold beam. At trial, plaintiff presented the expert testimony of Lawrence Dinoff, an architect, who opined that the automatic doors presented an unreasonable risk of harm to a certain segment of the population based on the existence of a coverage gap in the sensor system which would permit a person to be struck by the closing doors if he or she stopped in the door threshold and stood motionless in such a way as to not break the hold beam with his or her legs. However, on cross-examination, this expert conceded that his area of expertise was in overall building safety as opposed to automatic door systems.

¶ 8 The plaintiff also called as a witness Jeff McClain, an employee of Hershocks, the company that provided maintenance for the doors, who testified that he was at

---

6. In lieu of explaining apparent contradictions between her direct testimony and entries in her medical and employment records, Ms. Summers replied to many questions posed to her on cross-examination, "I accept what the records state, sir."

7. Defendant sought to establish that tens of thousands of identical door installations existed and included the doorways at Harrisburg Hospital, Harrisburg Airport, Strawberry Square, and the United States Senate Office Building.

the store a few days prior to and a few days after the accident and found the doors working as they were designed to operate. Mr. McClain testified that it was very unlikely that the condition of the doors had changed between the time of the accident and his inspection, and plaintiff offered no evidence to suggest a sudden malfunction. Mr. McClain also testified, on cross-examination, that the automatic door system, which was in compliance with all industry standards and codes, did not present an unreasonable risk of harm to users.

¶ 9 Further, another employee of Hershocks, Robert Fisher, was called as a witness by Summers and, on cross-examination, stated that other suppliers of automatic door systems currently continue to sell packages similar to the one which allegedly closed on Ms. Summers, as this type of package "still is an acceptable system, as far as standard."

¶ 10 The defendants also sought to establish that the damages claimed by Ms. Summers were unrelated to her fall and were caused solely by her pre-existing medical condition. One of plaintiff's expert witnesses, Dr. Leland Patterson, a neurologist, offered an opinion that the cause of most of Ms. Summers' present complaints was the fall at the 29th Street Giant, but defense counsel effectively cross-examined Dr. Patterson with evidence that Ms. Summers had been dependent on an electric cart for long distances since 1986, and had been told to avoid heavy lifting, bending or stooping due to physical problems caused by her pre-existing cerebral palsy and rheumatoid arthritis.

¶ 11 Giant, during the defense presentation, called three of Ms. Summers' coworkers at the U.S. Department of Agriculture, to testify regarding her condition after her fall at Giant. Each of these coworkers testified (1) that each had daily contact with Ms. Summers prior to her fall at Giant and afterwards, and (2) that each noticed no difference in the manner in which Ms. Summers interacted in the office before and after the accident.

¶ 12 Plaintiff presented John Risser, a vocational specialist who testified as to the future loss of income sustained by Ms. Summers as a result of her fall. However, on cross-examination of Mr. Risser, it was revealed that Ms. Summers had not fully informed him of her medical history prior to the fall and had failed to advise him that, prior to the fall she had had home aides for approximately eight hours each week. The defense also presented a vocational consultant, psychologist and rehabilitation counselor, Harold V. Kulman, who testified (1) that Ms. Summers had suffered no loss of earnings as a result of the accident at Giant, and (2) that the job evaluations of Ms. Summers were very positive both prior to the accident and afterwards.

¶ 13 Thus this case, as submitted to the jury, required the jurors to first make a number of credibility determinations as they considered whether, in fact, the fall suffered by Ms. Summers was caused by the operation of the doors at the Giant store rather than by the pre-existing physical problems experienced by Ms. Summers, and then to determine what injuries had resulted from the fall.

¶ 14 The jury, after considering all the evidence, rendered a verdict in favor of the defendants by answering the interrogatories set forth on the verdict slip as follows:

1. Was there any negligence on the part of the defendant Giant which was a substantial factor in Mrs. Summers' accident?

_____ Yes _X_ No

2. Was there any negligence on the part of the defendant Hershocks, which was a substantial factor in Mrs. Summers' accident?

_____ Yes _X_ No

3. Was there any negligence on the part of the defendant Stanley, which was a substantial factor in Mrs. Summers' accident?

_____ Yes _X_ No

4. Were there any defects in the products sold by the defendant Stanley at the time of the sale in 1983 which was a substantial factor in causing Mrs. Summers' accident?

_____ Yes   _X_ No

5. Were there any defects in the additional defendant Microwave Sensor's motion sensor which was a substantial factor in causing Mrs. Summers' accident.

_____ Yes   _X_ No

If you have answered NO to questions 1–5, return to the Courtroom.

The trial court, in response to the post-trial motions filed by Ms. Summers, concluded that the jury's finding that there was no negligence on the part of Giant which had been a substantial factor in Ms. Summers' accident "was so contrary to the weight of the evidence as to shock one's sense of justice. It was not contested that the doors closed on the plaintiff, whether on her shoulders or her cane, and that she then fell to the floor and suffered some type of injury which required hospitalization." However, as the foregoing recitation of the evidence presented at trial demonstrates, the defendants did contest the claim that the doors had closed on the plaintiff, and offered substantial circumstantial evidence in support of their position.

### III. APPEAL NO. 637 HARRISBURG 1997

¶ 15 Giant has raised three issues in its appeal at No. 637 Harrisburg 1997, framed as follows:

1. The trial court palpably abused its discretion and improperly infringed upon the exclusive province of the jury in granting a new trial against only one of four defendants where the testimony at trial was conflicting and where the

determinative issue in the matter was one of reasonableness.

2. Evidence of other incidents involving automatic doors at various Giant locations throughout the Commonwealth should have been precluded in the absence of competent evidence establishing that the factual circumstances surrounding such incidents as well as the unique door packages involved were "substantially similar" to the incident in question.[8]

3. The customer accident reports which were ultimately admitted into evidence contained impermissible hearsay and as such should have been precluded from evidence.

### A.   NEW TRIAL

¶ 16 Our Supreme Court, in *Riccio v. American Republic Insurance Co.*, 550 Pa. 254, 705 A.2d 422 (1997), recently observed:

... a judge makes two determinations in deciding whether to grant a post-trial motion for a new trial. First, the judge must decide if a mistake was made at trial as to a factual, legal, or discretionary matter. Second, the judge, in his discretion, must consider, under the circumstances of the case, whether the mistake was sufficient to warrant granting a new trial. *Morrison [v. Com., Department of Public Welfare]*, 538 Pa. 122, 133, 646 A.2d 565, 571 (1994).

Where, as here, the trial court articulates a single error (or a finite set of errors) as the grounds for granting a new trial, an appellate court's scope of review is limited to examining that particular error. *Id.* If the stated error concerns a question of law, it is reviewed on appeal as such. On the other hand, if the stated error involves a discretionary matter, it is reviewed on appeal for an

---

8. In view of our role as an intermediate appellate court, we have reviewed the rulings of the trial court on the admissibility of evidence of accidents involving electric doors at other Giant stores and have found each of those rulings correct. *See, e.g.: Valentine v. Acme Markets, Inc.*, 455 Pa.Super. 256, 687 A.2d 1157, 1162 (1997).

abuse of discretion. *Id.* at 133–34, 646 A.2d at 571.

*Riccio v. American Republic Insurance Co., supra* at 263, 705 A.2d at 426.

■ ¶ 17 As we consider the contention of Giant that the trial court erred when it granted Ms. Summers a new trial we are mindful that "[o]ur Supreme Court has held that a new trial should be granted only where the verdict is so contrary to the evidence as to shock one's sense of justice.... A new trial should not be granted where the evidence is conflicting and the jury might have found for either party, nor where the trial judge would have reached a different conclusion on the same facts." *Henery v. Shadle,* 443 Pa.Super. 331, 661 A.2d 439, 441 (1995), *appeal denied,* 542 Pa. 670, 668 A.2d 1133 (1995), citing *Cree v. Horn,* 372 Pa.Super. 296, 539 A.2d 446, 448 (1988), *appeal denied,* 519 Pa. 660, 546 A.2d 621 (1988).

■ ¶ 18 Ms. Summers proceeded against Giant solely on a negligence claim premised on her status as a business invitee. In order to set forth a *prima facie* case in a negligence action, a plaintiff must establish (1) that he was owed a duty of care, (2) that the duty was breached, (3) that he was injured, and (4) that his injuries were proximately caused by the breach of duty. *Ellis v. Sherman,* 512 Pa. 14, 18, 515 A.2d 1327, 1328 (1986); *Waddell v. Bowers,* 415 Pa.Super. 469, 609 A.2d 847, 849 (1992), *appeal denied,* 533 Pa. 613, 618 A.2d 402 (1992).

¶ 19 Here, the trial court properly charged the jury on the elements the plaintiff was required to prove in order to recover on her negligence claim. Further, the court instructed the jury that the duty owed by Giant, as a possessor of land, to its business invitees is set forth in Section 343 of the Restatement (Second) of Torts which provides:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343 (1965). *See: Estate of Swift by Swift v. Northeastern Hospital,* 456 Pa.Super. 330, 690 A.2d 719, 723 (1997), *appeal denied,* 549 Pa. 716, 701 A.2d 577 (1997). Thus, Giant correctly argues that in order for Summers to establish negligence on the part of Giant, she was required to prove at trial: (1) that the automatic doors posed an unreasonable risk of harm to some of its customers, and (2) that Giant knew, or by the exercise of reasonable care, should have known of that risk, and yet failed to protect its customers from that risk.

■ ¶ 20 Our Supreme Court, in *Coker v. S.M. Flickinger Co., Inc.*, 533 Pa. 441, 625 A.2d 1181 (1993), stated:

When considering whether the record supports the trial court's decision, we generally defer to the trial court's judgment because, by virtue of its position, it is uniquely qualified to determine factual matters.

An appellate court by its nature stands on a different plane than a trial court. Whereas a trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence, an appellate court's review rests solely upon a cold record. Because of this disparity in vantage points an appellate court is not empowered to merely substitute its opinion concerning the weight of the evidence for that of a trial judge.

*Thompson v. City of Philadelphia,* 507 Pa. 592, 599, 493 A.2d 669, 672–73 (1985). Where the record adequately

supports the trial court's reasons and factual basis, the court did not abuse its discretion. *Id.* at 599–600, 493 A.2d at 673. **However, if the record discloses that evidence was merely conflicting, then the new trial order would have to be reversed.** *Burrell v. Philadelphia Electric Co.*, 438 Pa. 286, 265 A.2d 516 (1970). **This is because in that situation, the trial court invaded the province of the jury.** *Carroll v. Pittsburgh*, 368 Pa. 436, 445–448, 84 A.2d 505 (1951). *Coker v. S.M. Flickinger Co., Inc.*, 533 Pa. 441, 452–453, 625 A.2d 1181, 1187 (1993) (emphasis added).

¶ 21 It is established beyond peradventure that credibility determinations are within the **sole** province of the jury. *Martin v. Weldon R. Evans, FORC Co.*, 551 Pa. 496, 505, 711 A.2d 458, 463 (1998). " 'A jury is entitled to believe all, part, or none of the evidence presented.... A jury can believe any part of a witness' testimony that they choose, and may disregard any portion of the testimony that they disbelieve.' " *Id., quoting Randt v. ABEX Corp.*, 448 Pa.Super. 224, 671 A.2d 228, 233 (1996). Instantly, in granting a new trial as to Giant, the trial court proceeded to its own factual determinations in assessing the risk posed by the automatic doors as well as whether the automatic doors had, in fact, closed on the plaintiff or her cane, specifically reciting:

> ... It was not contested that the doors closed on the plaintiff, whether on her shoulders or her cane, and that she then fell to the floor and suffered some type of injury which required hospitalization.

* * * *

Having decided the jury's finding as to negligence was contrary to the evidence, we also conclude that its finding that that negligence did not cause plaintiff's "accident" also against the weight of the evidence. As noted above, the doors struck either plaintiff's shoulders or her cane, entrapping her and then causing her to fall.

¶ 22 It is true that there was also an ample evidentiary basis for the factual findings made by the court, but the trial court is not permitted to sit as a 13th juror. This Court *en banc*, in *Mano v. Madden*, 738 A.2d 493 (Pa.Super.1999), recently affirmed the decision of the trial court to award a new trial where the jury had returned a verdict in favor of the defendant, despite the fact that liability had been determined as a matter of law, where "there was an expert concession that appellee suffered some injury (albeit a mild one)" as a result of the rear end collision caused by defendant. Unlike *Mano,* in the instant case the defendants contested not only the nature and cause of the plaintiff's injuries, but also challenged the very cause of Summers' fall by bright focus upon the issue of whether the fall had actually occurred as a result of contact with the doors.

¶ 23 Thus, it is clear that the jury in this case could reasonably find, based upon the evidence properly before it: (1) that there was no negligence on the part of Giant or Stanley because there was no unreasonable risk created by the automatic door system, (2) that any negligence on the part of the defendants had not been a factor in causing Ms. Summers' fall, and/or (3) that Ms. Summers suffered no injury as a result of her fall. Therefore, we are constrained to conclude that the trial court erred when it substituted its factual determinations for those of the jury and awarded Ms. Summers a new trial as to defendant Giant.

## IV. APPEAL NO. 708 HARRISBURG 1997

¶ 24 Summers has raised two issues in her appeal No. 708 Harrisburg 1997, framed as follows:

> 1. Did the trial court abuse its discretion by denying the appellant's motion for new trial when the jury verdict was against the weight of the evidence in that the evidence supporting the appel-

lee was inherently improbable and at variance with the facts of record?

2. Was it an error of law for the trial court to grant a new trial to just one defendant and not as to all defendants?

¶ 25 Summers contends that the trial court erred when it denied her request for a new trial against Stanley, against whom she had asserted both strict liability and negligence claims. For the reasons set forth above in the appeal at No. 637 Harrisburg 1997, we find that the trial court properly rejected the request for a new trial on the negligence claim against Stanley.

¶ 26 It remains, however, to address the rejection by the trial court of her strict liability claim. Ms. Summers sought to establish that the door package manufactured and sold by Stanley for installation at the 29th Street Giant in 1983 was defective under Section 402A of the Restatement (Second) of Torts as it was lacking an element necessary to make it safe for its intended use by a recognizable segment of the population. The door system had been manufactured and sold by Stanley in response to an order from Hershocks, based on the design specifications provided to Hershocks by defendant Giant's general contractor and architect who were engaged in the construction of the 29th Street Giant Market. The door system, as originally sold and installed, contained a Stanley Stan–Ray motion sensor.

¶ 27 The Stanley Stan–Ray motion sensor was replaced in 1987 with a very similar motion sensor manufactured by Microwave Sensors, Inc.[9] The evidence at trial established that Stanley notified Hershocks of the availability of its new Stan–Guard technology prior to the installation of the Microwave sensor, and Hershocks offered evidence to establish that it notified Giant of the availability of the new presence sensor to replace the motion sensors for a purchase price of $245.00.[10] An employee of Hershocks testified at trial that if Microwave's motion sensor was operating properly and if Ms. Summers actually walked through the threshold at a normal pace as she alleged[11], the doors would not have closed on her or her cane. Mr. McClain, another employee, testified similarly that if the sensor manufactured by Microwave was properly positioned and operating properly as Ms. Summers walked through the door without hesitation or stopping as she claimed, the doors would not have closed on her. The strict liability claim presented to the jury by Ms. Summers was premised upon the theory that the inability of the door system to "sense" a motionless or very slow moving person rendered the door package defective.

■ ¶ 28 A plaintiff proceeding under Section 402A of the Restatement (Second) of Torts is required to prove "(1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm." *Riley v. Warren Manufacturing Inc.*, 455 Pa.Super. 384, 688 A.2d 221, 224 (1997). The trial court properly ruled in the instant case that under the plaintiff's version of the facts, recovery under Section 402A would be justified. Thus, it devolved to the jury to determine the issue of causation.

■ ¶ 29 A plaintiff proceeding under Section 402A is not required to establish any notice or lack of due care on the part of the defendant, but, nonetheless, bears the burden of establishing factual causa-

---

9. Plaintiff executed a joint tortfeasor release in favor of Microwave Sensors, Inc. prior to trial.

10. Plaintiff introduced evidence that the cost of the sensor was $245.00, while an employee of Hershocks testified that the actual price offered was $345.00.

11. Ms. Shaw, who accompanied Ms. Summers to the store, testified that Ms. Summers had been walking at a normal pace all day, the same pace employed by Ms. Shaw.

tion, *i.e.*, in this case, that the alleged defect in the automatic doors caused the fall:

> ... Under Section 402A, plaintiffs bear the burden of establishing the existence of a defect, causation between the defect and the injury, and damages. *Jacobini v. V. & O. Press Co.*, 527 Pa. 32, 588 A.2d 476 (1991). In establishing a cause of action in negligence, plaintiffs bear the burden of demonstrating that there was a duty or obligation recognized by law, breach of that duty by the defendants, a causal connection between the defendants' breach of that duty and the resulting injury, and actual loss or damage suffered by the complainants. *Reilly v. Tiergarten, Inc.*, 430 Pa.Super. 10, 633 A.2d 208, 210 (1993). Essential to both theories is the element of causation. While our supreme court has admitted difficulty in defining exactly what constitutes the nexus between wrongful acts or omissions, *i.e.*, causation, it is beyond dispute that in this jurisdiction causation involves two separate and distinct concepts, cause in fact and legal (or proximate) cause. *See Reilly, supra.*

>> Cause in fact or 'but for' causation provides that if the harmful result would not have come about but for the negligent conduct then there is a direct causal connection between the negligence and the injury. Legal or proximate causation involves a determination that the nexus between the wrongful acts (or omissions) and the injury sustained is of such a nature that it is socially and economically desirable to hold the wrongdoer liable.

> *E.J. Stewart, Inc. v. Aitken Products, Inc.*, 607 F.Supp. 883, 889 (E.D.Pa.1985) (citations omitted).

*First v. Zem Zem Temple*, 454 Pa.Super. 548, 686 A.2d 18, 21 n. 2 (1996), *appeal denied*, 549 Pa. 701, 700 A.2d 441 (1997). *Accord: Riley v. Warren Manufacturing Inc., supra*, 688 A.2d at 226–227; *Schriner v. Pennsylvania Power and Light Co.*, 348 Pa.Super. 177, 501 A.2d 1128, 1132 (1985).

¶ 30 As the record contains substantial evidence to support the finding of the jury that there were no "defects in the products ... which was a substantial factor in causing Mrs. Summers' accident," the trial court properly denied the motion for a new trial as to appellee, Stanley Magic Door, Inc.

## V. CONCLUSION

¶ 31 We, therefore, vacate the order which granted the motion for a new trial and remand for the entry of judgment on the verdict returned by the jury.